In re S & D FOODS, INC., formerly known as Consolidated Pet Foods, Inc., a/k/a Consolidated Pet Food, Inc., North American Trading Co., Debtor.

Larry A. LARSEN, Plaintiff,

v.

CONSOLIDATED PET FOODS, INC., a/k/a Consolidated Pet Food, Inc., North American Trading Company, Donald A. Kunkel, Susan L. Kunkel, FBS Business Finance Corporation, United Protein, Inc., Marks and Clare, Escrow Agents, and City of Dodge City, Kansas, Defendants.

Bankruptcy No. 89 B 06041 J.
Adv. No. 89 C 0533.

United States Bankruptcy Court, D. Colorado.

Aug. 7, 1992.

G. Appel and M. Guyerson, of Rothgerber, Appel, Powers & Johnson, Denver, Colo., for United Protein, Inc. (Protein).

I. Kaiser and K. Kramer, of Berenbaum & Weinshienk, P.C., Denver, Colo., for Donald and Susan Kunkel (Kunkel).

L. Knowles and J. Powers, of McGrath, North, Mullin & Kratz, P.C., Omaha, Neb., for Larry A. Larsen (Larsen).

J. Logan, of Minor & Brown, P.C., Denver, Colo., for Consol. Pet Foods, Inc. (Debtor/Pet).

MEMORANDUM OF DECISION ON ADVERSARY PROCEEDING COMPLAINT AND COUNTERCLAIM [1,2]

FRANCIS G. CONRAD, Bankruptcy Judge.[*]

## TABLE OF CONTENTS

| | Page |
|---|---|
| PROCEDURAL POSTURE | 131 |
| FACTS | 131 |
| I. The Parties | 131 |
| (a) Larry A. Larsen | 131 |

1. FBS Business Finance Corporation was voluntarily dismissed from the proceeding.

2. Marks and Clare, Escrow Agents, and City of Dodge City, Kansas did not defend the complaint at trial. The Order emanating from this Decision will provide appropriately for them.

* Sitting by special designation.

| | | Page |
|---|---|---|
| (b) | Consolidated Pet Foods, Inc. | 131 |
| (c) | Donald Kunkel | 132 |
| (d) | Susan Kunkel | 132 |
| (e) | United Protein, Inc. | 132 |
| II. | The Witnesses | 132 |
| (a) | L. Mulherin | 132 |
| (b) | N. Minor | 132 |
| (c) | C. Miller | 132 |
| (d) | J. Sixta | 132 |
| (e) | D. Cribari | 132 |
| (f) | T. Dolfay | 132 |
| III. | The Background | 132 |
| (a) | The Pet Food Industry | 132 |
| (b) | Larsen and Pet within the Industry | 133 |
| IV. | Current Events | 133 |
| (a) | Preliminary Discussions and Negotiations | 133 |
| (b) | The Confidentiality Agreement | 134 |
| (c) | The Merger Agreement | 135 |
| (d) | Documenting | 136 |
| (e) | The Merger Announcement | 137 |
| (f) | The Merger of Operations | 139 |
| (g) | Sharing | 141 |
| (h) | The Grant Application | 144 |
| (i) | Financing the Deal | 145 |
| (j) | Inventory Buildup | 150 |
| (k) | Termination of the Venture | 151 |
| CLAIMS OF THE PARTIES | | 154 |
| DISCUSSION | | 155 |
| I. | Standing to Bring Certain Causes of Action | 155 |
| (a) | Pet and Protein | 155 |
| (b) | Donald Kunkel | 155 |
| II. | The Major Issues of Contract | 156 |
| (a) | Was there a Contract? | 156 |
| (b) | Did the agreement to merge result in a Partnership/Joint Venture Agreement or merely a loan? | 158 |
| (c) | Was there a fiduciary or confidential relationship under Colorado law? | 160 |
| (d) | Was there a Confidentiality Agreement? | 161 |
| (e) | Was there a breach of the Joint Venture Contract, and of the Confidentiality Agreement? | 161 |
| (f) | Was there a breach of fiduciary duty? | 162 |
| (g) | Was there a breach of the Partnership or Joint Venture relationship? | 162 |
| (h) | Is Pet entitled to contribution from Larsen for debts paid before and during the pendency of Pet's bankruptcy? | 163 |
| III. | Issues Pertaining to Interference with Contract and Prospective Economic Advantage | 163 |
| IV. | Fraud, Misrepresentation, Nondisclosure and other Torts | 165 |
| (a) | Fraud, Misrepresentation, and Nondisclosure | 165 |
| (b) | Civil Conspiracy | 167 |
| (c) | Breach of Uniform Trade Secrets Act | 168 |
| V. | Damages—Pet | 168 |
| VI. | Kunkel's Claims | 169 |
| (a) | Fraud in the Inducement and Execution | 169 |
| (b) | Civil Conspiracy to Acquire Kunkel's Interest in Pet | 169 |
| (c) | Outrageous Conduct | 169 |
| (d) | Interference with Dodge City Lease | 170 |
| (e) | Interference with York Lease | 170 |
| (f) | Affirmative Defenses | 170 |
| CONCLUSION | | 170 |

The present dispute[3] centers upon a monetary contribution in calendar year 1988, claimed by Larsen to be a loan, but by the various defendants to be a capital contribution. Larsen claims the loans are collateralized. The defendants counter with fraud and other causes of action. We hold that Larsen loses his suit for the numerous and various reasons stated in this Memorandum of Decision.

## PROCEDURAL POSTURE

Pet filed for bankruptcy protection under 11 U.S.C. §§ 101, *et seq.* on May 5, 1989. This adversary proceeding was commenced by Larsen through the filing of an original complaint on May 18, 1989 seeking declaratory judgment and other relief. The original complaint has been amended on two separate occasions and a "Second Amended Verified Complaint" naming Protein (formerly Consolidated Acquisitions, Inc.), the acquirer of Pet, and other defendants was filed and served on or about July 10, 1989. The amended complaint served the purpose of having all parties to this action, and two previously initiated State Court actions, in one forum. On August 14, 1989, Protein filed its "Answer and Counterclaims" and shortly thereafter, under Court Order entered on September 25, 1989, Protein and others filed their amended answers and amended counterclaims. Kunkel, on the eve of the trial, added an amended affirmative defense under 15 U.S.C. §§ 1691, *et seq.*

The present dispute centers around a merger between Pet and Larsen, and upon an alleged capital contribution or loan made by Larsen to Pet during late calendar year 1988. The capital contribution or loans are allegedly collateralized by certain assets of Pet that have been acquired by Protein in the bankruptcy or are encumbered by the liens of FBS Business Finance Corporation (FBS), whose claims have also been acquired by Protein.

## FACTS

The facts in this adversary proceeding are uncomplicated but voluminous.

### I. The Parties.

#### (a) *Larry A. Larsen.*

Plaintiff Larsen is a businessperson who resides in Omaha, Nebraska. He is engaged primarily in freezer storage and warehouse related services (T.17)[4] through corporations and entities Larsen owns. His principal business, Millard Refrigerated Services (Millard), formerly L & B Corporation, d/b/a Millard Warehouse, is also located in Omaha, Nebraska (T.21). Millard is the corporate parent of several separate corporations and partnerships, and provides management, accounting, planning, and legal services for Larsen, as well as other entities owned and controlled by Larsen. One of the services provided by Larsen, via his entities, is the processing of pet foods. Larsen has done this for approximately 15–20 years (T.20).

#### (b) *Consolidated Pet Foods, Inc.*

Pet was also involved in the pet food business (T.22), producing and purchasing products from the slaughter industry. Pet upgraded the product it purchased for sale to pet food canners (T.595). It has been in the pet food business for at least four years. It was a single entity company with operations and plants in several states. It is a Chapter 11 debtor under Title 11, U.S.Code.

---

**3.** We have jurisdiction to hear this matter under 28 U.S.C. § 1334(b) and the general reference to this Court by the United States District Court for the District of Colorado, General Procedural Order No. 1984–3. The appearing and defending parties consent to an entry of final judgment in all matters that arise in this adversary proceeding. This Memorandum of Decision constitutes findings of fact and conclusions of law under F.R.Civ.P. 52, as made applicable by F.R.Bkrtcy.P. 7052.

**4.** References are to the transcript pages. Exhibits, for purposes of this Memorandum Decision, are designated "L" for Larsen; "CAI" for Protein; "CPF" for Pet; and, "K" for Kunkel.

### (c) *Donald Kunkel.*

Kunkel was the President, Chief Executive Officer, and sole shareholder of Pet (T.594). He is Susan Kunkel's first spouse. He and Susan Kunkel have one child by their marriage.

### (d) *Susan Kunkel.*

She is Donald Kunkel's second spouse.

### (e) *United Protein, Inc.*

Protein purchased substantially all of the assets of Pet at a Bankruptcy Court approved sale on July 28, 1989 (CAI.100, 102). Included in the sale was all of Pet's personal property, including

> [a]ll claims, actions, lawsuits, choses in action, and other rights of the Debtor, whether fixed, contingent, matured, unmatured, liquidated or unliquidated, and whether arising pursuant to agreement or in law or equity, and including all claims or rights of the Debtor, pursuant to §§ 544 through 549 of the Bankruptcy Code.

(CAI.102). Thus, Protein is the real party in interest for some causes of action, but not for all of Pet's claims in this proceeding.

## II. The Witnesses.

In addition to Larsen and Kunkel, each party called several witnesses, either in person or by deposition, to support their respective positions. We tally only the major witnesses here, but will interlineate our findings with minor players as the facts are processed.

### (a) *L. Mulherin.*

Mulherin, an attorney, is Vice–President and General Counsel of Millard, and personal counsel and financial advisor to Larsen, whose agent he was. Mulherin was an active participant in the events of this adversary proceeding. Mulherin's credibility is one of the keys to the outcome of this matter (T.300–301).

### (b) *N. Minor.*

Minor, an attorney, was personal counsel to Donald Kunkel, and counsel to Pet for over ten years. Minor was an active participant at some points in this matter, and at other junctures he was left out in cold storage. Credibility is not an issue with this witness.

### (c) *C. Miller.*

Miller is a former Vice–President of FBS Business Finance Corporation. FBS, the successor of Columbia Savings and Loan Association (Columbia), was a named defendant in this matter. Miller's knowledge pertains to Pet's financial position before, and during, the events that took place in this adversary proceeding.

### (d) *J. Sixta.*

Sixta, a present employee of Protein, is the former Group Vice–President of Pet. Sixta has substantial knowledge regarding the matters raised in the complaint, the defenses, and counterclaims. Sixta was especially privy to the sales and procurement activities of Pet (T.90).

### (e) *D. Cribari.*

Cribari was Pet's and Kunkel's Certified Public Accountant.

### (f) *T. Dolfay.*

Dolfay is a Millard Vice–President. Although to some extent a minor player, Dolfay's performance during the events which led to the signing of the promissory notes at issue here, and his courtroom testimony and demeanor, make him, like Mulherin, a cornerstone to our findings.

## III. The Background.

### (a) *The Pet Food Industry.*

Both Kunkel and Larsen agree that the pet food industry in which they operated is very small and close knit. It contained approximately five or six canners who controlled more than 70% of the pet food market. Some names that we all recognize are Carnation, Gerber, and StarKist. Without business from the top canners, a company has no market for its product (T.142). As Larsen explained, word of insolvency or

bad credit can be disastrous to a company in the pet food industry (T.141–142, 691), *i.e.*, "canners won't do business with you" (T.36). Because the number of participants in the pet food business is so small, many deals are made verbally. For instance, both Larsen and Kunkel completed transactions, excluding the matter at hand, without having written contracts. The overall testimony and evidence leads us to conclude that both Larsen and Kunkel were businesspersons who made their own deals, and let their attorneys and accountants work out the details and paperwork later.

(b) *Larsen and Pet within the Industry.*

In August 1988, just prior to the major events in this adversary proceeding, Pet's position within the pet food industry involved the procuring and purchasing of products from the slaughter industry and upgrading that product for sale to pet canners.

From 1984 to 1988, Pet showed a steady and substantial rise in its sales calculated in pounds. The 1984 sales were 9–10 million pounds; 1987 sales were 18–19 million pounds; and 1988 was up to 29–30 million pounds (T.912).

In August 1988, Pet's payables were current (T.803). Its two largest customers included Carnation and its two largest suppliers were Excel and Monfort (T.911–12).

According to Miller, Vice–President of FBS (Pet's primary pre-petition lender), Pet was believed to be a viable company in spite of operating losses sustained in 1988 from a shipment of contaminated beef (T.886–887).

FBS, via its predecessor, Columbia, had provided Pet with a $2.6 million dollar revolving line of credit (later increased to $3 million in 1988), secured by accounts receivable, inventory, and equipment. In lending industry terminology, it was an asset-based loan, with a good rating for that type of loan. When FBS took over Columbia in November, 1988, the rating was lowered but not to a substandard classification. As will be discussed later, FBS would not finance the money Larsen put into Pet, not because Pet was a risk, but because FBS lent asset-based money, not term money; and term money is what Pet needed to pay off Larsen.

During 1988, Pet was erecting a facility at Des Moines, Iowa. FBS provided no term construction financing for this facility, but intended to finance the receivables, inventory, and equipment once Des Moines came on line (T.902–903). In fact, Pet essentially internally financed the construction in Des Moines (T.596). Pet also had facilities in Amarillo, Texas and Dodge City, Kansas.

Larsen, via his entities, had a facility in Friona, Texas (it was near Amarillo, by Texas geographical standards), Dodge City, Kansas, and Des Moines, Iowa. Additionally, there were plants in Iowa City, Iowa, Sioux City, Iowa (Iowa/Nebraska) and Lincoln, Nebraska (T. 100–101). Bernie Hurley, Kunkel's ex-father-in-law, is the president of Iowa/Nebraska.

One of the key differences between Larsen's operation and Pet's operation was Larsen didn't own product. His entities processed it (T.22), whereas Pet actually purchased the product and resold it (T.23). Nevertheless, both parties competed for the same raw materials (T.913). The overall testimony from all witnesses shows that Larsen and Pet were competitors. In fact, competition between the two was extremely fierce at the Texas and Kansas facilities (T.913). There is no doubt from the overall testimony that Pet's Dodge City plant was to be a new competitor for Iowa/Nebraska (T.595, 917–18) when it came on line.

IV. Current Events.

(a) *Preliminary Discussions and Negotiations.*

Prior to, or during, August, 1988, Pet was not for sale; was not looking for a partner or an investor in its business; was not attempting to sell any specific plants; and, was not attempting to obtain long term financing for any of its facilities (T.595). Further, there was no industry rumor in August, 1988 that Pet was interested in selling any of its facilities (T.172–73).

Nevertheless, on August 15, 1988, Larsen instructed T. Jackes, one of his employees, to call Kunkel and inquire whether Pet was interested in selling its Dodge City plant (T.21). At the time, Larsen was in need of upgrading, expanding, and diversifying the Dodge City facility to accommodate the needs of his customers (T.596–99, 76). It made more sense to Larsen to acquire Pet's plant rather than both Pet and Larsen having pet food plants in the Dodge City area (T.76). The purpose of Jackes' inquiry was to see if opportunities existed through Pet prior to Larsen expanding his Dodge City facility (T.160).

Although Kunkel told Jackes that Pet had no interest in selling its Dodge City facility, Jackes asked if he and Larsen could visit Kunkel for further discussion of the matter (T.598). Kunkel apparently acquiesced because shortly thereafter Larsen and Jackes traveled to Denver to discuss the matter with Kunkel (T.21).

On August 18, 1988, Larsen and Jackes met Kunkel and Sixta in Denver (T.599–600). While in Denver they proposed that Pet and Larsen start a relationship, not just at Dodge City, but at all their respective locations (T.23). To this end, Larsen proposed that he and Kunkel tour their respective plants (T.601–602). These discussions continued by phone over the next few days (T.24).

On August 24 and 25, 1988, Kunkel and Larsen, accompanied by Cribari, toured their respective facilities, including Pet's Des Moines, Dodge City, Amarillo, and York facilities, and Larsen's Dodge City, Friona, Texas, Omaha, and Des Moines facilities (T.602-603, 76, 78, 24). Larsen and Kunkel travelled in Larsen's private airplane (T.145).

During the tour, Larsen and Kunkel discussed their respective operations (T.25). Additionally, Cribari discussed with Larsen basic concepts for combining his and Pet's operations (T.968). Kunkel also disclosed to Larsen certain financial problems Pet had experienced in prior years, including a loss of approximately $900,000 during fiscal 1987 related to a product quality problem shipped to Spillers in the United King-dom (T.28), and that Pet had lost approximately $500,000 from February 28, 1988 through August, 1988 (T.28). Larsen told Kunkel his pet food operations had lost approximately $300,000 for the year and that the obvious reason was he and Pet had competed for the same raw materials, thus driving up the cost of those materials (T.605–606).

Larsen was able to estimate the value of Pet's plants because of his experience in the construction business (T.75). Based on this valuation; a financial statement for Pet for the year ended February 28, 1988; and conversations with Cribari and Kunkel, Larsen concluded that Pet was a viable operation and had an approximate net book value of $1 million (T.29–30). At the conclusion of the August 24 tour, Larsen, Kunkel, and Cribari met with Mulherin in Omaha (T.301). At this meeting, Larsen told Kunkel that he wanted to do a deal with Pet (T.606). Larsen outlined a deal where Pet would contribute its assets to a new entity, Larsen would loan Kunkel $1 million that Kunkel could infuse into the new entity, and Larsen would contribute an additional $2 million in cash to the new entity (T.303). It was Cribari's understanding that the transaction would result in both Larsen and Kunkel being 50% owners of Pet (T.968); however, no final agreement was reached at that time (T.606).

Larsen and Kunkel met again on August 30 or August 31, 1988 (T. 607). During this meeting, they had more discussions about combining their pet food operations (T.608), and further discussed Pet's net book value (T.29). Mulherin was later assigned by Larsen to follow up on the Pet transaction on a day-to-day basis (T.85); although at this date(s), we cannot find a "deal" had been made.

### (b) The Confidentiality Agreement.

Mulherin was asked to prepare a Confidentiality Agreement (T.302, 354) because most of Pet's business information that Larsen wanted to review as part of the merger was proprietary and confidential (T.358). Minor first became aware of the proposed deal between Larsen and Pet in

August, 1988 when Kunkel asked him to review the Confidentiality Agreement (T.569–70). Minor revised the Confidentiality Agreement proposed by Mulherin prior to its execution (T.570; CAI.6). Although Minor was sent a copy of the Confidentiality Agreement, on August 31, 1988, by Mulherin's secretary, Mulherin testified that he did not know at this time who Minor was (T.355). On several occasions during the trial we had problems with Mulherin's memory. In our view, it was a selective memory. This Court has heard many times the defense "my secretary (or employee) sent it, but I didn't know about it" in any number of adversary proceedings. But, who is ultimately responsible for work performed by an employee—the superior or the employee? We think the superior. In Mulherin's case, he may have been too busy to worry about who received, what was in his view, an "insignificant" confidentiality agreement, but we are not. We find that Mulherin knew as of August, 1988 that Minor was Pet's and Kunkel's counsel. Moreover, the attorney-client relationship between Minor, Pet, and Kunkel was a continuing one; Mulherin could not reasonably conclude otherwise because he had no knowledge to the contrary despite his assumptions and conclusions in later testimony.

On September 1, 1988, Larsen executed the Confidentiality Agreement, acknowledging that both he and Kunkel would be touring and discussing each other's facilities; would be reviewing confidential business information; and, that all information obtained would be held in confidence (T.83). The Confidentiality Agreement was intended to protect all proprietary information including customer lists (T.1231–32). The Confidentiality Agreement provides in part:

> Each party agrees and acknowledges that any proprietary information which it receives from the other party must be maintained in the strictest confidence and used solely and only for the purpose of evaluating the desirability of proceeding with the Acquisition.

(CAI.6) Kunkel received and executed the Confidentiality Agreement in the first or the middle part of September, 1988 (T.704).

Although the Confidentiality Agreement names Millard and Pet as parties (T.302–303), it would bind not only the corporate entities but also their agents and employees. The relationship that the Confidentiality Agreement created between Larsen and Pet, and their agents, is difficult to compartmentalize. While it is clear there was a euphoria of trust prior to the executions of the Confidentiality Agreement, its execution paved the way for an exchange of information (mostly flowing from Pet and Kunkel to Larsen), which, if revealed, would place the other at a competitive disadvantage not only between themselves, but also within their industry.

(c) *The Merger Agreement.*

Although the general terms of the deal between Pet and Larsen were outlined on August 24 (T.490), it was not until September 10, 1988, at a meeting between Kunkel and Larsen in Omaha (T.609), that Larsen proposed that the two entities merge as 50/50 partners. Larsen offered to infuse $2 million of capital into the new entity (T.609). Kunkel countered that from the deal he wanted $2 million for himself personally (T.610). Kunkel accepted Larsen's offer and Larsen and Kunkel shook hands on the deal (T.611). Thus, as of September 11, 1988, Larsen and Pet (via Kunkel) had an agreement to merge. Larsen made it clear to Kunkel at this time that they had cut a deal and that they should leave all the legal and accounting work up to the appropriate professionals (T.616). Larsen told Kunkel that Mulherin would handle all of his legal and accounting responsibilities. Kunkel likewise informed Larsen that Cribari and Minor would be handling Pet's legal and accounting affairs (T.614). Thus, the deal between Larsen and Pet was substantially similar to a prior deal between Larsen and Iowa/Nebraska, *i.e.*, based on a handshake, with legal and accounting personnel to follow-up (Depo. of Hurley, pp. 10, 11).

There is no doubt Larsen intended to bind himself with Kunkel and Pet to a merger of some sort. A deal was struck, with the details to be ironed out later.

There was no reservation on either side. We make this finding not only from the direct evidence submitted by the parties, but also from watching both Kunkel and Larsen testify. Although Kunkel appeared to be a beaten man due to the financial difficulties that were a direct result of this transaction, we find him to be honest and forthright. And, although Larsen appeared to have ice-water in his veins, we find him no less straightforward. What we have here are two businesspersons, one less sophisticated than the other, who made a deal and left it for their employees (Mulherin and Minor, as examples) and agents to work out the details. What the deal was is subject to dispute. Kunkel looked at it as a partnership, and the evidence shows he had good reason to believe it was a partnership.

Immediately thereafter, Larsen introduced Kunkel to both Mulherin and Dolfay as his "new partner" (T.613). Larsen and Kunkel then flew in Larsen's private jet to Larsen's facility in Batavia, Illinois. Again, Larsen introduced Kunkel to Batavia's general manager as his "new partner" (T.16). Upon returning from the trip to Batavia, Kunkel announced to his spouse that "the deal is done, we've merged" (T.1067), and that, thereafter, he would be responsible for managing 10 to 12 plants and would be traveling extensively because of the deal (T.1068).

There was, however, no written partnership agreement between Pet and Larsen (T.725). There was only an oral agreement and a handshake (T.721–22), with an intent to later document the terms of the deal (T.723).

(d) *Documenting.*

Mulherin started to document the deal between Larsen and Pet just after September 11. This is reflected by a draft Letter of Intent, dated September 14, 1988, and an accompanying Asset Purchase Agreement (T.31–32, 75, 304; L.4, 6, 7) and supplement to the September 14 Letter of Intent which incorporated Larsen's agreement to pay Kunkel $500,000 blue sky (T.32).

On September 19, Mulherin and Minor met with Cribari, B. Wells of Minor and Brown, and Dolfay and J. Marr, both employees of Larsen, to discuss the September 14 Letter of Intent (T.483). At this meeting, Mulherin insisted the merger be based on book value so that the debits and credits of the deal added up. As we recall from the testimony, Mulherin wanted to determine Pet's book value so that: (1) the loan amount from Larsen to Kunkel could be determined, and (2) a determination could be made about whether Kunkel would need to contribute Pet's Dodge City facility, worth approximately $500,000, which Kunkel owned individually, to make up any shortfall in Pet's book value (T.981–83).

Based in part on Cribari's and Minor's difficulty in receiving responses and revisions from Mulherin (T.969–71), the Letter of Intent was not finalized until December 1, 1988. In fact, Mulherin had not commenced revising the Letter of Intent until the morning of November 28 (T.439). Mulherin prepared the December 1 Letter of Intent (T.375–76) and dealt directly with Minor regarding its terms (T.467). According to Mulherin, prior to obtaining Kunkel's signature on the December 1 Letter of Intent, Mulherin apprised Minor that he would be doing so. Mulherin, however, did not send Minor a copy of the final Letter of Intent (T. 376); an inaction on Mulherin's part which we find inexcusable.

The written details, as documented in the December 1 Letter of Intent, made only one major change to the September 11 agreement (T.721, 733). It reflected a reduction in Pet's net book value from $1 million to $500,000 (T.84–85, 69–70). This change had been agreed to previously on November 2. The change reflects our view that a deal had been made back in September because it was an area that the parties had agreed was flexible; otherwise, all other terms remained the same from September.

Larsen and Kunkel admit that the December 1 Letter of Intent summarized the deal between the parties (T.69, 283, 480, 664–65; L.43). The December 1 Letter of

Intent was signed by both Kunkel and Mulherin, on Larsen's behalf (T.69, 48; L.23). Although the December 1 Letter of Intent (CAI.18) was addressed to Kunkel as President of Pet, and was signed by Kunkel individually, it was intended to, and did, bind both Pet and Kunkel individually (T.519).

(e) *The Merger Announcement.*

Prior to the signing of the December 1 Letter of Intent, we look back to September 15, 1988. At that time (four days after agreeing to merge), Kunkel and Larsen mailed and telexed a written announcement to their customers and suppliers in the pet food industry, including Spiller, Acacia Foods, Carnation, Kal–Kan, Quaker Oats, Ralston, Excel, Monfort, and Iowa Beef Products, announcing the amalgamation of their businesses (T.85–88, 183–4; CAI.15).

Sixta drafted the announcement (T. 914; CAI. 15). But prior to sending it, he faxed a copy to Larsen for his approval and changes, if any. Larsen in fact made changes to the announcement to clearly identify himself as Chairman of the Board of the combined companies. Larsen also approved the final version of the announcement before it was sent to customers and suppliers (T.916–17). Because the announcement is important to an understanding of the parties' agreement, we recite it in full:

> I would like to take this opportunity to inform you of the merger between Consolidated Pet Foods and Millard Refrigerated Services pet foods operations. The merger will result in one company which will be Consolidated Pet Foods, Inc. The result will be a much larger and healthier company.
> The management of the company will be as follows:
>> Larry Larsen—Chairman of the Board
>> Don Kunkel—President and C.E.O.
>> Gene Bedford—Executive Vice-President
>> Joe Sixta—Group Vice-President Sales
>> Ron Schmehr—Vice-President Operations
>> Joe Leamen—Vice-President Transportation/Quality Control
> Consolidated Pet Foods, Inc. will now be able to service the pet food industry in many areas and intends to continue to be an asset to both the packing industry and pet food industry. The direction of Consolidated is to service the industry and add value, not cost.
> Today, truly we are a "consolidated" pet food company servicing what we feel is the future of this business. The "new" Consolidated will allow us to better address the needs of both suppliers and customers.
> Thank you for your continued support,
> Don Kunkel
> President & C.E.O.

It was the general consensus in the industry that the merger between Larsen and Pet would be beneficial to both entities. G. Merrick of Hereford Bi–Products in Texas recalls a visit by Larsen in the fall of 1988, at which time Larsen explained what was going on between him and Pet (Depo. of Merrick, pp. 15–16). Merrick was not surprised by the news of the merger because Larsen and Pet competed geographically, and, looking at a map, it made sense that they would try to work together (Depo. of Merrick, p. 18). Likewise, B. Stanley, Larsen's pet food operations manager, believed the merger between Pet and Larsen was a good business decision because they were competing against one another for product, and by merging, the competition would be eliminated (Depo. of Stanley, pp. 78–79). R. Sutter, the manager of Larsen's Friona operation, also agreed that the merger between the companies was a good business decision because they had previously competed in the same cities (Depo. of Sutter, pp. 42–43). An additional benefit of the merger was that larger volumes of product could be run through fewer plants (T.821).

Both Kunkel and Larsen announced the merger to their respective employees. Kunkel announced to both Sixta and G. Bedford, Pet's chief financial officer, that

Pet and Larsen would be combining their operations (T.951), and that they should consider Larsen's personnel part of Pet's organization and should share all information with them (T.951).

Kunkel announced the merger to C. Miller of FBS (formerly Columbia Savings) on September 15 (T.861–2). He told Miller that Larsen and Pet had reached an agreement to merge and that Larsen would be contributing $3 million in capital into Pet (T.862). Kunkel told Miller that the deal with Larsen was a handshake deal, but that documentation would be created in due course (T.892–3). Miller was insistent that Kunkel used the term "capital" to describe the infusion of cash. To do otherwise would violate the loan agreement Pet had with FBS.

Also on September 15, Larsen met with his plant managers (T.89) and announced the deal with Pet (Depo. of Stanley, pp. 18–19). According to Don Sutter's contemporaneous notes taken at the September 15 managers' meeting, Larsen announced that Millard was a growing company and cited his involvement with Pet as an example of growth. Specifically, Larsen stated that with the purchase of Iowa/Nebraska, his employees had increased from 550 to 700, and that with his involvement in Pet, there were now 1,000 employees and a total of 19 plants. Additionally, Larsen announced there were now four company presidents; one for his warehouse group; one for the Pet group, being Kunkel;[5] one for Millard Processing Systems, a bacon processing facility; and one for Iowa/Nebraska pet foods, being Hurley (Depo. of Sutter, pp. 35–38). Larsen's announcement at the September 15 plant managers' meeting verifies that he believed he and Pet had a deal; if not as of September 11, certainly four days later at the managers' meeting.

A glimpse of Larsen's motives in associating with Pet may be seen by considering statements he made at the September 15 managers' meeting. At that meeting, according to Sutter, Larsen announced that

he was considering buying a cold storage freezer in York, Nebraska and Des Moines Cold Storage. Both of these freezer facilities were doing business with Pet. If Larsen could get control of Pet, and pull Pet's business out of those two freezers, it would hurt their (Pet's) business such that Larsen would be capable of purchasing them (Pet) (Depo. of Sutter, pp. 38–39). This would increase Larsen's cold storage and warehousing capabilities.

Further, according to Sutter, Larsen announced on September 15 that his Omaha pet food operations were to be transferred to Pet's Des Moines facility; his Friona operations to Pet's Amarillo facility; his Dodge City operations to Pet's Dodge City facility; and his Lincoln operations to Pet's York facility (Depo. of Sutter, pp. 39–40). After transferring his pet food operations to Pet, Pet would then store its product in his warehouses, again increasing Larsen's warehousing business (Depo. of Sutter, p. 40). Admittedly, these operations were not a substantial part of the various facilities' capacities; nevertheless, it is evidence of the fact a deal was made.

After the September 15 plant managers' meeting, Larsen and Kunkel made joint sales calls to some of their respective customers, including Carnation, StarKist, Kal–Kan, and Gerber, to discuss additional services that the combined company would offer, including buying, selling, and processing meat products (T.89–92). Larsen believed these trips were a good opportunity to show customers the possibilities of the new company (T.186). Moreover, September is a critical month in the pet food industry because contracts for the last quarter are negotiated during that month (T.254).

Larsen and Kunkel also visited with many of their suppliers and customers in the industry to announce the merger. On September 19, Larsen and Kunkel visited Carnation in Los Angeles, the canner of Friskies pet foods (T.617), to announce the merger of Pet's and Larsen's pet food oper-

---

**5.** As will be shown later, *see, page 140, infra,* it is not clear if Kunkel understood this particular structure under the deal.

ations. Carnation was purchasing approximately 25 million pounds of mechanically deboned beef (MDB) and 50 million pounds of red meat from Pet each year. Around August, 1988, Pet's annual volume was approximately 150 to 170 million pounds (T.617–19). Carnation was an important customer to Pet. R. Layton, Senior Vice President in charge of purchasing, distribution, and administration at Carnation, and C. Regan, also of Carnation, recall that at the September 19 visit, the merger announcement (CAI.15) was distributed, and Larsen said he would be investing in Pet (Depo. of Layton, pp. 6, 10, 11, 14, 21–24) (Depo. of Regan, p. 11; T.620, 90–91).

Larsen and Kunkel also met with Kal–Kan on September 19, and had basically the same discussions (T.626). J. Jurczak, purchasing manager of meats for Kal–Kan Foods, recalls that at the September 19 meeting, Larsen and Pet announced they had put their businesses together and tried to solicit business from Kal–Kan. Jurczak also remembers the announcement (Depo. of Jurczak, pp. 6, 10–13).

Larsen later arranged a meeting with Gerber, one of his customers. Gerber and Pet were competitors (T.944). Larsen controlled this meeting and informed Gerber that he and Pet were rolling up their pet food operations and that as part of that effort, Larsen would be discontinuing its freezer operation in Dodge City. This would have an adverse impact on Gerber (T.93–95, 629; CAI.94). Gerber cut short the meeting because while Larsen was soliciting Gerber's business, Pet's people were trying to woo Gerber's customers. Kunkel and Larsen met with G. Clain, the Chairman of Gerber (Depo. of Clain, pp. 5–6). Clain recalls that, at the meeting, Larsen disclosed that his pet food operations had merged with Pet's, and that the pet food freezing services previously provided by Larsen would henceforth be provided by Pet (Depo. of Clain, pp. 9–11). Larsen admits that he told people in the last quarter of 1988 that he and Pet had a new company (T.279). Larsen further explained to Clain that he would no longer have any function in the pet food business but that all of his pet food business would be channeled through Pet (Depo. of Clain, pp. 11–14). It appeared to Clain that Larsen and Kunkel had already reached an agreement when they made the joint presentation (Depo. of Clain, pp. 14–15). Gerber had previously received a copy of the announcement.

Thereafter, on October 10, Kunkel and Larsen met with J. Bierce of StarKist in Los Angeles, again announcing the merger (T.187, 630). Approximately two weeks later, Kunkel and Bierce took a tour of both Pet's and Larsen's facilities (T.630–31).

During the fall of 1988, Kunkel often used Larsen's private plane, with Larsen's authorization, for their mutual purposes, including taking representatives from Kal–Kan and StarKist on a tour of Pet's facilities (T.184–85, 749). The primary objective of the tour with Kal–Kan was to market Pet and attempt to convince Kal–Kan to buy product from Pet (T.873).

In late 1988, Larsen also arranged a meeting between himself, Kunkel, and T. Dittner, a partner in Cactus Feeders Company, to open the door for Pet to purchase dead animals from Cactus Feeders (T.113–115).

In October, 1988, Sixta, Kunkel, Larsen's accountants, and Mulherin also met with representatives of Polish Ocean Liners, who provided the transportation function to Pet for export business. They discussed the merger between Pet and Larsen and how it would benefit Polish Ocean by increasing the amount of containers Pet shipped overseas (T.431, 922–24). Although documentation had not been completed at the time of the Polish Ocean meeting, according to Sixta and Larsen's people he dealt with, the merger had been completed (T.954).

### (f) The Merger of Operations.

Kunkel's duties with Pet were primarily in operations, although he was its Chief Executive Officer. After September 11, and the merger, his duties changed. He reorganized and phased-out operations of both Pet and Larsen. Kunkel traveled extensively as part of this phase-out process (T.633). During the last quarter of 1988,

Kunkel managed and controlled both Pet's and Larsen's facilities (T.795–96). Although Larsen disputes that Kunkel was running his pet food operations (T.1213, 1215), the deposition testimony of B. Stanley, whom Larsen admits was a loyal and truthful employee, is to the contrary.

Stanley was the manager of Larsen's pet food operations. His duties included monitoring product quality, new product acquisition, new tonnage acquisition, customer service for all of Larsen's plants (Depo. of Stanley, p. 7), and overseeing the daily operations of the individual plant managers at each location (Depo. of Stanley, pp. 9–10). Stanley's employment was terminated on December 31, 1988 (Depo. of Stanley, p. 7), by Mulherin, who said that because Larsen was no longer processing pet food products at his plants, but rather at Pet's plants, Stanley was no longer needed (Depo. of Stanley, pp. 12–13). Larsen told Stanley that after he was terminated, Kunkel would run all the pet food operations (Depo. of Stanley, p. 64). This is consistent with Kunkel's testimony that, as of September, 1988, he was in charge of both Larsen's and Pet's pet food operations.

In early November, Larsen prepared and provided to Kunkel an organizational chart outlining the new entity's relationship with Millard. (T.821; CAI.2). Kunkel objected to the chart because it did not reflect Larsen and Kunkel as full partners (T.676); but rather, reflected Pet as one of Larsen's wholly-owned entities. Kunkel discussed his objections with Larsen (T.852–53, 855). Based on his observations of Larsen and Kunkel, Miller likewise believed that Kunkel and Larsen were partners (T.883–84). The organizational objection raised by Kunkel seemed to go nowhere with Larsen. But Kunkel did not adequately explain it to us either. Nevertheless, we are still left with the firm conviction that the objection did not sour the "done deal."

Additional organizational changes were made from an accounting standpoint; specifically, Larsen's own accounting records. Millard's general ledgers contain intercompany accounts set up for companies owned or controlled by Larsen (T.550). During October 1988, Larsen created an intercompany account and an investment account for Pet (T.551–553; CAI.129). This treatment is in accordance with a belief that an investment had been made.

Kunkel and Larsen evaluated all of their respective geographical areas to decide whether to close a facility. During weekly conference calls with managers, Larsen would set target dates for transferring his closed operations to Pet (Depo. of Sutter, pp. 83–84).

Kunkel and Larsen jointly decided to close Larsen's Omaha and Des Moines facilities, and move Larsen's equipment into Pet's operations (T.750). J. Leaman, Pet's Vice President of operations (Depo. of Leaman, pp. 7, 12), understood that Larsen was discontinuing his pet food operations in Lincoln, Dodge City, Omaha, and Des Moines, and that all of that product would be processed at Pet's facilities. Larsen did close these plants and product was transferred (Depo. of Leaman, pp. 60–61, 30).

Steps to phase-out Larsen's Omaha and Des Moines operations commenced in September, 1988 (Depo. of Stanley, p. 27). Leaman discussed with Stanley, around September 28, in Omaha, discontinuing Larsen's operation in Omaha and processing that product in Pet's Des Moines plant (Depo. of Leaman, p. 47). Larsen's pet food operation in Des Moines was shutdown at the same time Pet's Des Moines facility came on line. The Larsen Des Moines shut-down created more product volume for Pet to run through its facility. Larsen also stopped pet food processing at Iowa/Nebraska and shifted all product to Pet's Des Moines facility (Depo. of Hurley, p. 18). By closing his plants, Larsen provided much of the start-up product for Pet's Des Moines facility (T.259–60).

Prior to the Des Moines start-up, Stanley put Leaman in touch with Levich, a Larsen employee in Omaha, to make arrangements for Pet's trucks to transport Larsen's product from Omaha to Des Moines (Depo. of Leaman, pp. 66–67). Thereafter, Leaman worked closely with Levich in getting product from Sioux City to Des Moines for the

start-up of the Des Moines operations (Depo. of Leaman, p. 68).

In the latter part of December, 1988, Larsen and Kunkel also jointly decided to sell Pet's Greyhound Division, shut down Pet's Amarillo plant, and expand Larsen's Friona operation (T.635). In August of 1988, Kunkel did not intend to close Pet's Amarillo plant (T.635), but had made the decision to diversify the facility (T.735–35). But, there was also testimony that the Amarillo plant was constantly being evaluated for profitability prior to August, 1988. After the merger, Kunkel thought the Amarillo facility could become profitable by rolling it together with Larsen's Friona operation, thus increasing volume (T.738–39). Larsen, however, demanded that the Amarillo plant be closed (Depo. of Leaman, pp. 27–28, 82). Amarillo was closed the week of January 10, 1989 (T.636–37, 987–88; Depo. of Sutter, p. 88). Larsen announced the closure of Amarillo to the staff (Depo. of Stanley, pp. 44–46). This control by Larsen supports many of Pet's and Kunkel's affirmative defenses and counterclaims.

Kunkel believed that the Greyhound Division was a growing industry. He was optimistic about its potential (T.637–38, 842). Although Kunkel wanted to keep the operation going, Larsen disagreed, emphasizing his interest in enhancing the Friona operation (T.638–39). The Greyhound Division was sold in the latter part of December, 1988 (T.639).

After September, 1988, there were daily discussions in Pet's offices in Denver regarding merging operations. Leaman met frequently with Levich, Stanley, and B. Smola (a Larsen employee) to discuss how the plants would operate after the merger (Depo. of Leaman, p. 40). Leaman also discussed with Mulherin, in September of 1988, and with D. Miller, Larsen's employee in charge of bacon processing, on October 21, 1988, joint transportation opportunities between Larsen and Pet (Depo. of Leaman, pp. 44–45, 64).

Prior to September, 1988, Pet did not store product in Larsen's warehouses because they were competitors. After Sep-tember, 1988, however, Pet started storing product in Larsen's warehouses (T.106–107). Pet became a customer of Larsen only because of Larsen's 50% interest in Pet (Depo. of Sutter, pp. 22–23). According to Larsen, Pet was going to utilize his cold storage warehouse in every location where Pet had a facility (Depo. of Sutter, p. 31). Pet's storage of products at Larsen's facilities benefitted both parties because Larsen had extra warehouse space and Pet had product (Depo. of Sutter, pp. 33–34).

Pet started storing product in Larsen's warehouses in September, 1988. Larsen requested that Pet move its inventory into his warehouses to keep all warehousing costs "in the family" (T.690). To avoid third-party storage costs, Pet went so far as to transport product from Dodge City, Kansas all the way to Larsen's Friona, Texas facility. Although additional freight costs and in-and-out charges were incurred, Larsen wanted to keep all product within the organization (T.690). Pet also transported product from its Amarillo facility to Friona. This seemed ridiculous to Sutter because there was freezer space available in Amarillo and Pet did not have to incur the added cost of transportation (Depo. of Sutter, pp. 21–22).

(g) *Sharing.*

Larsen and Kunkel also discussed personnel, including hiring and firing of employees (T.639). Larsen was not impressed with Bedford, Pet's Vice President in charge of finance, and did not think Bedford had a place in the new entity. Larsen suggested that Kunkel fire Bedford, and Kunkel reluctantly did so in the latter part of December, 1988 (T.640–41, 819). Kunkel had never planned to fire Bedford before that time, and without Larsen's suggestion, would not have done so (T.641). In early November, Kunkel received a position description of a Senior Vice President, Legal and Financial (T.675; CAI.2) that showed Mulherin as the Senior Vice President, Legal and Financial. This position was similar to that which Bedford held at Pet, and which Mulherin had told Miller and Kunkel

he was *taking over* (T.820). Kunkel was shown as the President of Pet.

In addition to firing Bedford, other personnel changes were made. Stanley, Larsen's manager in charge of all pet food operations, was directed to report directly to Sixta and Kunkel on a day-to-day basis (T.634, 810). Levich, of Iowa/Nebraska, also reported to Kunkel (T.811). Additionally, employees of Iowa/Nebraska were put on Pet's Des Moines payroll (T.724–725). Further, Kunkel and Larsen agreed that Leaman would be the Vice President for the mid-west division of the new entity, in charge of pet food operations in Iowa City, Sioux City (Iowa/Nebraska), Des Moines, and York. Also, Pet would be taking over the management of Larsen's pet food operations. Larsen provided Pet with a list (Leaman's Depo. Exhibit 52) of employees whom Larsen recommended Pet hire or were available for hire if Pet needed them. Pet did hire various Larsen employees at its operations (Depo. of Leaman, pp. 29–34, 41).

As part of the combination of their operations, Pet and Larsen also shared their manufacturing equipment. In late 1988, Kunkel provided Leaman with a complete list of equipment belonging to Larsen, which was to be delivered to Pet (Depo. of Leaman, pp. 31–32; Leaman's Depo. Exhibit 52; CAI.58). Additionally, Stanley was instructed by Larsen to transfer equipment to Pet's plants (Depo. of Stanley, p. 23). Significant amounts of Larsen's equipment were transferred to various Pet facilities during September and October (T.109–110; Depo. of Leaman, pp. 33, 53). The equipment included nearly all of Larsen's pet food equipment and anything else that Pet requested (Depo. of Stanley, p. 23), including certain plate freezers owned by Larsen, which were transferred to Pet's York, Nebraska facility (Depo. of Leaman, p. 31). Larsen no longer needed the equipment because he would no longer be processing pet foods at his plant (Depo. of Leaman, p. 34).

Larsen specifically instructed Stanley to transfer all of the pet food equipment at his Omaha and Des Moines facilities to Pet's facilities because Larsen's product was to be processed at Pet's plants. Stanley was instructed by Larsen to work with Kunkel on this matter (Depo. of Stanley, pp. 24–25). Stanley met with Pet employees Leaman, I. Clark, and R. Mueller, on September 28, 1988, in Omaha, to discuss the equipment transfer and when Pet would start servicing Larsen's Omaha accounts (Depo. of Stanley, pp. 31–33). There was no written agreement or lease concerning the equipment transfer (T.110).

Prior to September, 1988, Larsen had never lent any equipment to Pet because they were competitors (T.111–13). Larsen admits that he made the joint sales calls with Kunkel, loaned equipment to Pet, and advanced money to Pet to "get the new company started and financed" (T.264–65).

Pet also shared its financial, banking, and customer information with Larsen. On November 1, 2, and 3, R. Ferdig, a CPA who performed accounting services for both Larsen individually, and the Millard companies since 1969, looked at Pet's books and records to determine their credibility and to determine Pet's September 30 book value, as contemplated by the September 11 agreement (T.33, 521–25, 316).

The book value determination was necessary because it would drive the amount Kunkel would contribute to the new company (T.492). Larsen had told Kunkel that when his accountants were through making adjustments to Pet's books, Larsen and Kunkel would make whatever adjustments were necessary in their deal (T.753). Larsen thought the book value amount was Kunkel's responsibility; and in our view, it was why he didn't originally verify it when he "sealed" the deal with Kunkel.

Ferdig's analysis began with Pet's balance sheet, dated August 31, 1988, which reflected a net book value of $999,449.46 (T.525; L.9) Ferdig was provided access to, and looked at, Pet's general ledger. Specifically, he looked at the accounts receivable, accounts payable, and bank reconciliations (T.527, 532–33; L.14, 15). Ferdig and Mulherin were also provided access to Cribari's working papers (T.960–61). Fer-

dig was not denied access to any documents that he requested to see (T.548).

On November 1, Ferdig determined that Pet's net book value was overstated by *at least* $457,000 and was actually closer to $500,000 than the $1 million originally estimated by Kunkel (T.40, 528). Additionally, Ferdig suspected other problems with Pet's books, as reflected in notes made during his examination (L.14, 15). Based on this information, Kunkel volunteered to contribute the $500,000 of blue sky he was to receive from Larsen to the new entity to make up the shortfall (T.40–41, 320–1; L.6).

Ferdig again examined Pet's books the week of November 14 (T.531). During this trip, Ferdig prepared a September 30 trial balance from Pet's general ledger, and prepared working papers documenting each of Pet's asset and liability accounts (T.532; CAI. 65). When he left, Ferdig took a three foot high pile of papers with him to Omaha, including copies of all Pet's general ledgers (T.532). All the information used by Ferdig in his analysis was obtained from Pet and not from any outside sources (T.536–7).

Dolfay, Larsen's person in charge of marketing and business planning, was sent to Denver in October, 1988, by Larsen, to direct and assist Pet in organizing a marketing program and formulating a business plan (T.1177). Prior to September, 1988, Larsen had not sent any of his personnel to assist Pet because he and Pet were competitors (T.107, 1177).

Dolfay spent September 19 and 20, 1988, and two days before Thanksgiving, at Pet's offices (T.1166) directing and assisting Sixta in preparing a written sales and marketing plan (T.924–25; CAI.59). Dolfay was shown Pet's sales strategy and forecasts, including both the actuals for 1988 and the projections for 1989, by plant, by customer, and by target customers for 1989. This information included plans to increase sales to various customers and product development. Sixta provided this information to Dolfay in mid-December, 1988. Sixta testified he was reluctant to put this information on paper because he had no control over where it was going, and because this information was confidential and proprietary (T.925–26). The information would never have been shared with Dolfay, Larsen, or Millard prior to August, 1988 (T.926–8; CAI.41, 42, 45, 46, 47, 50, 59). Sixta's last involvement with Dolfay was about December 12, 1988 (T.931). Dolfay, however, signed two purchase orders on behalf of Pet during January, 1989 (T.1167–68), after Larsen had decided Kunkel was not to be part of the deal.

In the fall of 1988, Dolfay also prepared a business plan for Millard (T.249; CPF. 45). The business plan refers to Millard and Pet as sister companies (T.251) and discusses Pet throughout (Depo. of Sutter, pp. 71–72).

Pet disclosed other information in addition to that shared with Dolfay. In September, 1988, Sixta and Levich discussed merging their operations, the fact that they would be working very closely together, and the sharing of scheduling and procurement information (T.918). During these conversations with Levich, Sixta disclosed Pet's customer base, who it was selling to, the types of products it was selling, and the prices it was receiving for various product. Again, this information had not been previously disclosed because Pet and Iowa/Nebraska were competitors (T.918–19).

At the September, 1988 Las Vegas American Meat Institute convention, Kunkel and Sixta met with Levich and Hurley and again shared purchasing information, sales information, contract information, production information, and marketing information (T.920). From September, 1988 to February, 1989, Sixta was in daily contact with Levich discussing sales, pricing, customers, combining transportation, and other business information (T.951–52).

Larsen was also provided access to Pet's profit sharing plans, worker compensation or insurance claims, financial statements, certified audits, interim financial statements, employment agreements, vendor agreements, and service agreements (T.307–309, 961, 311, 315, 374–75).

During Leaman's meetings with Larsen's representatives, he provided information to

them about Pet's operations and allowed them to tour Pet's facilities and watch production procedures, and on November 14, Leaman showed Levich how to wash tripe for export (Depo. of Leaman, pp. 68–69), all of which Leaman considered confidential information. Likewise, Leaman disclosed Pet's pricing structure and customer lists (Depo. of Leaman, pp. 55–57).

Some of Larsen's customer contracts were transferred to Pet for handling, including Excel, which was transferred at Larsen's instruction. Stanley informed Kunkel of the Excel contract transfer on December 19, 1988. Stanley did not have to explain to Excel why the contract was being transferred because it was well known in the industry that Pet and Larsen had merged. Also, after Larsen ceased his Omaha pet food operations, his customers, including Beef Nebraska, South Omaha Packing Company, and Shannon Packing Company were serviced by Pet. Likewise, in October or November of 1988, when Larsen shut down his Des Moines and Dodge City operations, equipment and customers, including Kal–Kan, were transferred to Pet (Depo. of Stanley, pp. 25–41).

Miller first met Mulherin on September 27, 1988. Miller understood that Mulherin was Larsen's point man who would be overseeing Larsen's investment in Pet, reviewing Pet's operations, and generally providing financial and administrative input. Mulherin told Miller that he was to be the chief financial officer of the new entity and the person in charge of the entity's banking activities (T.371, 479, 863–64).

On September 27, Miller discussed Pet's banking relationships with Mulherin. Miller reviewed the audited financial statements of Millard and Larsen that were provided by Mulherin. Mulherin requested that Miller keep the financial information discreet and not talk about it with anyone from Pet because it was confidential information (T. 866–67). Prior to discussing Pet's banking relationships with Mulherin, Miller had never discussed Pet's banking

relationships with any other company Pet had done business with because it was privileged and confidential information. Miller disclosed the information to Mulherin only because he was authorized to do so by Kunkel (T.867–68). In late October, Kunkel also sent Mulherin copies of Pet's promissory notes due Columbia Savings (T.479–80).

Miller also discussed with Mulherin the Columbia letter agreement that had increased Pet's operating line to $3 million. It included a summary of the terms and conditions of Pet's credit facility (T.868; CAI.96). The letter agreement sets forth restrictions on borrowing by Pet that specifically prohibited any borrowing other than normal trade debt without Columbia's approval. Mulherin reviewed the letter agreement (T.868–69). We find from our opportunity to observe Mulherin that he had the financial sophistication to understand the significance of the letter agreement re: debt restriction.

(h) *The Grant Application.*

On behalf of the new entity created by the merger between Larsen's and Pet's pet food operations, a grant application was filed with the State of Nebraska. J. Marr, a Larsen employee, began working on the grant application as early as September 19, 1988 (T.418–19). The purpose of the grant application was to obtain an interest buydown from the City of York for the purchase of plate freezers for Larsen's and Pet's York, Nebraska plant (T.121). The City of York, however, would not advance the funds until a new corporation was formed to apply for the grant. The corporation formed was CPF–MRS Acquisitions, Inc.[6] Larsen was an officer and director of CPF–MRS Acquisitions, Inc. (T.116–17, 420–21).

Minor's firm assisted in preparing the articles of incorporation for CPF–MRS Acquisitions, Inc. (T.572, 417). On November 7, 1988, Minor's associate, B. Wells, forwarded drafts of the articles, bylaws, origi-

---

6. "CPF" was derived from Consolidated Pet Foods, and "MRS" from Millard Refrigerated Services.

nal minutes, stock certificates, and instructions to Mulherin for his review (T.574; CAI.27). After they were finalized, they were filed, on November 28, 1988, with the Colorado Secretary of State, and recorded copies were faxed to Mulherin on December 2, 1988 (T.573–74).

After he and Marr prepared the grant application, Mulherin submitted it to the City of York in December, 1988. Larsen signed the application in his capacity as Chairman of the Board of CPF–MRS Acquisitions, Inc. Larsen did not read the grant application before signing it; but rather, relied on the representations of Mulherin regarding its contents (T.120–21, 118; CAI.29). It is significant that Larsen, like Kunkel, relied heavily on his advisors. Both Larsen and Kunkel are individuals who look at the big picture and use their staffs to implement and cover the details. This type of behavior is not unusual for these two people.

By letter dated December 12, 1988, Mulherin informed the City of York that Larsen would be incurring $2 million in costs associated with the start-up of the new entity (T.496–7; CAI.28).

In describing the parent-subsidiary relationships of CPF–MRS Acquisitions, Inc., the grant application stated:

CPF–MRS Acquisitions, Inc. is a Colorado corporation formed in November of 1988 to acquire the assets of [Pet]. The company has no parent or subsidiary relationship; however, Larry Larsen, who holds a 50 percent ownership interest in the company, is also the majority stockholder of Millard Refrigerated Services, Inc., of Omaha.

Hearings on the grant application were held in York in December, 1988 (T.485). Although information from a spreadsheet that K. Teichmeier, Millard's Vice President of Accounting and Treasury, had prepared while at Pet on November 1, 1988 was used in preparing the grant application (CAI.31; T.393–94, 397–99), Kunkel was not aware of the grant application until mid-December, 1988 (T.642). After discovering the grant application had been submitted, Kunkel talked with Larsen, who told him not to worry about it, that he was just raising funds for the merged entity (T.642–43). Kunkel apparently acquiesced to this, and we find his acquiescence not unusual. It is evident from the testimony as a whole that Larsen had the financial finesse, and Kunkel the management finesse. Kunkel was willing to rely on that financial finesse for the mutual benefit of all parties.

(i) *Financing the Deal.*

As part of his obligations under the September 11 merger agreement, Larsen was to contribute $2 million in capital to Pet. Larsen met this obligation through four cash transfers.

During September, October, and November, Kunkel and Larsen talked on the phone almost daily (T.632). During September, they had discussed, a minimum of a dozen times, Pet's cash flow problems (T.643–44). The overall evidence leads us to conclude that Larsen knew the causes of Pet's cash needs, and that he could not, or should not, have been surprised by them. On October 6, 1988, after Columbia notified Pet that it was going to return Pet's checks unpaid because of a $500,000 overdraft, Kunkel called Larsen and requested funds. Larsen agreed that he would infuse $500,000 of the capital contribution required by the merger deal with Pet (T. 644–45). Larsen knew that if Pet's checks were returned unpaid, Pet would no longer be a viable business (T.36, 713).

On October 6, 1988, Larsen caused Millard to wire transfer $500,000 to Pet's Columbia Savings account (T.37; CAI.19). Although taken from Millard's account, the $500,000 advance to Pet on October 6 was made with Larsen's individual funds (T.59).

According to Larsen, after wiring the $500,000 on October 6, 1988, he and Kunkel discussed Pet's future financial needs (T.35–36, 404–405, 494–95). Kunkel indicated that Pet needed $1 million to get its accounts payable current (T.36).

On October 26, M. Ellis, Pet's controller, called Kunkel in Omaha and told him that Columbia was again going to return checks

and that Pet needed $250,000. On October 26, 1988, Larsen advanced an additional $250,000 to Pet from Millard's FirsTier account (T.38, 125, 645–46; L.11).

When Larsen infused the $250,000 on October 26, the word "lien" was never used and Kunkel did not understand that Larsen was "loaning" (sic) money to Pet (T.647–48). In fact, Kunkel had never discussed with Larsen or Mulherin the need for a promissory note for the money that Larsen was putting into Pet (T.648).

By October 26, 1988, Pet's cash flow problems were intensifying because it was incurring $50,000 to $200,000 in inventory buildup per week (T.646) due to the merger. Larsen was aware of the continued inventory buildup and the negative cash flow because he had talked with Kunkel about this problem on many occasions (T.647).

The third transfer was advanced on November 2, 1988. Larsen advanced an additional $250,000 to Pet by a check drawn on Millard's FirsTier account (T.39; L.12). Larsen and Kunkel had prearranged the November 2 contribution when Kunkel was in Omaha on October 26. Larsen had agreed to infuse the additional funds based on discussions he had with Kunkel about Pet's continued inventory buildup, negative cash flow, past due accounts payable, and substantial overdrafts (T.649, 652).

Minor met with Mulherin on November 1, 1988, representing both Pet and Kunkel as counsel (T.572). Upon Mulherin's request and based on information provided by Mulherin, Minor prepared the original $1 million dollar promissory note and guaranty. Kunkel was not present at the meeting when Mulherin asked Minor to prepare the note. Mulherin delivered the $250,000 check. In return, Mulherin received the promissory note from Pet and a personal guaranty from Kunkel for all funds previously advanced. (T.589, 591, 321–22; L.13).

Kunkel was not aware that Larsen wanted documentation on the $1 million dollar capital contribution until Mulherin presented him with the promissory note on November 2 (T.650, 823). Mulherin, however, described the promissory note as merely a

"track" for the $1 million (T.650–51). Therefore, Kunkel did not understand that it would have to be repaid; but rather, thought it was necessary for Larsen's accounting purposes (T.651). Kunkel understood Mulherin's use of the word "track" to mean only that Larsen needed some documentation to account for the $1 million (T.824–25).

Although the November 2 promissory note (Exhibit L. 13) does not name a payee, the evidence and testimony clearly indicate that Larsen was the intended payee. Larsen advanced the funds (T.409–410), and Teichmeier testified that the intended payee on the $1 million dollar promissory note was Larsen (Depo. of Teichmeier, p. 69).

It is also clear to this Court that all funds advanced by Larsen to Pet through November 2, 1988 were intended to be capital contributions and not loans. The evidence in support of this finding is compelling. The best indicator, Larsen's own notes, reflect that as of November 3, 1988, he considered the $1 million as capital (T.132, 60–62; CAI.115), and that he understood the difference between capital and a loan. Larsen's understanding of "capital," in conjunction with his contemporaneous notes, clearly indicates that Larsen intended the $1 million dollar advance to Pet to be part of his capital contribution to the "merged entity."

Likewise, Kunkel understood that the $1 million in funds was part of Larsen's capital contribution to the merger. To Kunkel, capital meant cash that is infused into a company and does not need to be repaid (T.648, 727, 789).

Additionally, prior to the October 6, 1988 advance, Miller spoke with Mulherin and was assured that the overdrafts were going to be covered and that the $500,000 was a capital injection (T.870–71). Larsen admits that the call to Miller was made prior to funding the $500,000 (T.124–25). Miller asked Mulherin for a copy of the Letter of Intent or asset purchase agreement because he was skeptical that the money was capital. Mulherin responded that the deal so far had been a handshake agreement

and that the $500,000 in capital was an indicator of Larsen's good faith (T.865–66).

After November 3, Kunkel and Larsen continued to discuss, approximately ten times in November alone, Pet's inventory buildup and Pet's need for additional cash (T.652–53, 741–42). During the week of November 21, Larsen requested that Kunkel determine the amount of money needed by Pet. Based on discussions with Pet personnel, Kunkel determined the need was approximately $1.5 million. Larsen said he would not contribute $1.5 million, but that he would infuse the last $1 million of his $2 million obligation under the merger deal.

Although Larsen believed that the merger would be concluded in a short period of time, on either November 22 or 23, he told Kunkel that he wanted some protection for the funds he was placing into Pet because Kunkel was traveling so much and there was always the possibility that something would happen to Kunkel. They discussed "protection" on both Pet's Dodge City and Des Moines facilities. According to Larsen, this protection was merely a stop-gap measure pending completion of the merger. Larsen informed Kunkel that Mulherin would be preparing some interim documents in case Kunkel should "drop out of the sky." Larsen and Kunkel again discussed this matter on Friday, November 25, the day after Thanksgiving (T.654–660, 351). Neither Mulherin nor Minor were parties to these conversations.

On November 24, Thanksgiving Day, Larsen asked Mulherin to prepare loan documents for the $2 million, security documents for Pet's assets in Dodge City and Des Moines, and personal guaranties for Kunkel and his spouse (T.326). Mulherin and an associate spent the weekend of November 25, 26, and 27, 1988 preparing the loan and security documents (T.43–44, 345). Mulherin did not mention the loan documents to Minor although he talked with Minor on November 25 with regard to revising the Letter of Intent (T.451–52, 588, 577, 345). Mulherin did not tell Minor he was sending the documents to Kunkel to be signed, nor did he ask Minor's approval or consent to send documents directly to Minor's client (T.578, 465). After the documents were signed, Mulherin did not inform Minor that Kunkel had signed them (T.359). Minor was unaware that Kunkel had signed the documents on November 28, 1988. Upon learning in February, 1989 that Mulherin had prepared the loan documents and sent them to his client, Minor testified he was shocked and stunned (T.580).

Mulherin says Kunkel never told him Pet would be using Minor's legal services (T.462). This is, at best, self serving, and, from our view, a blatant lie. It is clear to us that Mulherin at all times knew Minor represented both Kunkel and Pet. Mulherin testified he met with Minor on September 19, 1988 and November 1 or 2, 1988, and had conversations with Minor on November 15 or 16 and November 24 or 25 (T.438).

Minor had clearly disclosed his representation of Pet to Mulherin on September 19. It is also clear from the evidence that Mulherin intentionally withheld the loan documents from Minor's perusal and consultation. We discount entirely Mulherin's deposition testimony at p. 220 that he assumed Kunkel's attorney would review them. He contradicted this statement when, in his deposition at p. 76, he said it never occurred to him to contact Kunkel's attorney. The fact that Kunkel wanted the money in a hurry doesn't wash the fact that Minor never got to look at the documents.

On Monday, November 28, Dolfay carried the loan and security documents (Exhibit L.16) by plane to Denver for Kunkel's signature (T.45). Mulherin had called Kunkel earlier that morning and informed him that he was sending documents for his and his spouse's signatures. Mulherin told Kunkel not to worry about the documents, that they were merely stop-gap measures. During his conversation with Mulherin, Kunkel assumed the documents were merely some sort of protection to ensure that there was adequate insurance on him should he die before completion of the

merger documentation.[7] Mulherin also told Kunkel that he was faxing all documents to Minor (T.656–68). Kunkel did not call his lawyer because of that representation (T.772). Kunkel called his spouse and said he was bringing Bedford and Dolfay to the house for her to sign documents (T.1070–1071).

Dolfay arrived in Denver at approximately 2:00 p.m. MST. The exact time is unknown. After arriving, Dolfay and Bedford entered Kunkel's car to travel to Kunkel's house. Bedford was driving. Bedford's attendance had been requested by Mulherin (T.765). Bedford was necessary because he was Pet's corporate secretary. Dolfay sat in the rear right side of the car behind Kunkel, who was the front seat passenger. Before reaching the house, Dolfay handed Kunkel a packet containing the documents (T.659–660). The documents were in a sealed manilla envelope (T.829). Dolfay testified that he saw Kunkel reading the documents in the car. But, from Dolfay's, and Kunkel's, position in the car, Dolfay could not possibly see if Kunkel was reading the documents. We find it is more plausible that Kunkel "flipped" through them, as he testified, but highly unlikely he would have had time to read them because the trip from the airfield to Kunkel's house was of short duration. (T.660, 830). To our knowledge, Bedford never testified about what Kunkel did during this car ride.

It is important to understand the scene at which the documents were signed. After a short ride from the airport, all parties arrived at Kunkel's personal residence. Susan Kunkel was there with the Kunkel's ill child. The child was apparently feverish and irritable. Pleasantries were exchanged. Dolfay told us that at one point Kunkel was holding the baby. After Kunkel saw the first document he excused himself and immediately called Mulherin. This was at approximately 2:02 p.m. MST (T.660–661, 647, 448; CAI.7, 17). Kunkel again asked Mulherin what the documents were about. He was informed by Mulherin

that they were merely stop-gap measures and that Kunkel should not worry about them. Mulherin laughed at Kunkel's anxiety and reassured him that they merely interim documents pending final documentation of the merger (T.661–62, 793).

Kunkel then started signing the documents (T.662). Kunkel did not read the documents, but merely flipped through them to where they had been pre-marked with signature stickers (T.770, 1077, 1181). Kunkel signed the documents because Mulherin said he wanted them that day, and because Mulherin had assured him of what their nature was (T.771). Susan Kunkel was unable to see any of the face pages of the instruments she was signing because they were opened only to the signature pages (T.1080–81). The entire process took about 10 minutes (T.1080). It had taken Mulherin, an attorney, 1½ hours to review the documents prior to sending them to Kunkel (T.445).

What also concerns us is Dolfay's behavior during the signing. Susan Kunkel testified that Dolfay seemed nervous, and was sweating in a cold environment. Dolfay was also nervous during his testimony, particularly when he looked at his employer, Larsen, which he did often. We think he had reason to be nervous because he was aware of the importance of the documents. At trial, he told us he didn't know the content of the documents. But in his deposition, at p. 26, he said Mulherin told him about the contents. Our review of other documentary evidence prepared by Dolfay depicts an individual with enough business refinement that he had to have known what was happening at Kunkel's residence on November 28. Alternatively, his testimony of ignorance is outright reckless disregard of the facts as presented. We don't believe he was a knight in some grand scheme to hurt the Kunkels, but certainly he was a pawn with knowledge—knowledge that he tried to keep from this Court during the trial.

7. Interestingly, Mulherin had previously performed a title search and UCC search on Pet

and Kunkel in September, 1988 (T.330).

After signing the documents, Kunkel again felt uneasy about the lack of opportunity to review the documents (T.771) and called Mulherin a second time, a half-hour later, to ensure that Mulherin in fact sent copies of the documents to Minor. Mulherin again laughed at Kunkel's concern and reassured him there was absolutely nothing to worry about (T.662–663, 837; CAI. 71, 72). Mulherin also said he would inform Miller about the documents (T.777). Kunkel did not have Minor review the November 28 documents because Mulherin had assured him that Minor had already been contacted and that Mulherin was keeping Minor abreast of things (T.839).

From the time Dolfay, Bedford, and Kunkel arrived at the house to the time they left was about 45 minutes (T.1072). After signing the documents, Kunkel flew to Amarillo to meet with Larsen (T.663–64). Kunkel left the documents with Bedford, who had been instructed by Mulherin to mail them by Federal Express for immediate recording (T.662, 837; CAI.75). No copies were provided to Pet or to the Kunkels. Susan Kunkel testified she never learned the contents of the documents until March of 1989, when she received Court papers. She learned in May or June, 1989 what a guaranty was.

On November 28, 1988, Kunkel thought the documents contained the necessary protection for Larsen in case something happened to him so that Larsen could proceed with the merger because they had already rolled the physical operations of their businesses together (T.792). Kunkel was not aware that there was a promissory note in the stack of documents (T.792). Kunkel's expectation was that Larsen was going to contribute his last million dollars into the company. He was not anticipating a loan (T.762). Further, when discussing the need for protection, Kunkel and Larsen did not discuss a personal guaranty (T.764). At the time Kunkel signed the documents, he did not know that he was signing a personal guaranty (T.776). The November 28 promissory note supports Kunkel's understanding that it was protection in case he died; it provides that it becomes "automati-

cally due and payable . . . should the undersigned [Kunkel] die" (L.16A).

Prior to funding the $2 million required by the November 28 documents, Larsen demanded that Pet pay off the $1 million promissory note, dated November 2, 1988, with interest (T.43, 133). As an additional prerequisite to funding the $2 million, Mulherin required that all of the security documents be recorded (T.343–44).

On December 7, 1988, various transactions by which Larsen funded the $2 million and Pet paid back the original $1 million plus interest transpired (T.127). Initially, Larsen transferred $1 million to Pet out of Millard's account at FirsTier. Next, Miller transferred $1,012,356.16 to Larsen, in payment of the November 2 promissory note with interest. Larsen then transferred an additional $1 million to Pet (T.46–47, 878–79; CAI.74; L.22). Thus, there was only a net contribution to Pet of $987,643.84.

In Larsen's words, the net effect of the transaction was that Pet "paid off the note, and we had the mortgage for $2 million" (T.47). Kunkel was not aware that the $1 million dollar note was repaid in this fashion because he did not handle or have personal knowledge of the fund transfers (T.815).

Prior to the transfers, Mulherin had requested that Miller provide him with wire instructions to help facilitate that transaction. Miller did so. All instructions as to how the wire transfers were to be made were obtained from Mulherin (T.874–79; CAI.72). To induce Miller to issue the wire transfer instructions, Mulherin told Miller that Millard had not documented the initial $1 million correctly from an accounting standpoint, and that the $1 million in, $1,012,356.16 out, and then $1 million back in again was designed to balance their books (T.877). The second $1 million in was always characterized by Mulherin as capital (T.874–75). It is clear that Mulherin controlled and directed the entire transaction. And there is no doubt that that was what he was supposed to do. He had the financial wherewithal, and Kunkel relied on this.

Although all transfers on December 7 were made to or from Millard's account, the advances were made with Larsen's personal funds. We had some problems with this evidence; however, Larsen does not dispute this finding. In fact, during June of 1989, after Pet filed for bankruptcy, an audit adjustment transferred the funds from Millard's books to Larsen's books (T.470, 539–545; L.36, 37, 39).

As with the first $1 million contribution, we also conclude that the second $1 million advance on December 7 was intended to be capital and not a loan. Not only does the total advance fit squarely within the terms of the December 1 Letter of Intent, which had just been executed, but Miller testified that Mulherin continually characterized the second $1 million as capital and part of the merger deal (T.874–77). Additionally, when the loan was first entered on Millard's books, it was treated as capital. Ironically, Pet treated it as a loan. The various uninformed staff employees of Pet treated the transaction based on what they understood the transaction to be, or what the documents purported it to be. In Millard's case the money was clearly capital. In Pet's case, and with no further information, the accounting people read the documents to conclude it was a loan. The irony here is that, in Court, Larsen wants it treated as a loan and Kunkel wants it treated as capital.

On December 6, D. Hoganson, head of the FBS business credit for First Bank System, met Larsen in Omaha, who was represented to be Kunkel's new partner (Depo. of Hoganson, p. 9). During the meetings with Mulherin, Larsen, and Kunkel, Hoganson was informed that Larsen was injecting $3 million in capital into Pet. There was no mention of any loans by Larsen to Pet (Depo. of Hoganson, pp. 13–14).

Kunkel also thought the overall purpose of the $2 million was Larsen's investment, as they agreed to, as part of the merger (Depo. of E. Muelhaupt (President, Des Moines Cold Storage Co.), pp. 15–16). Leaman likewise understood that the money was infused by Larsen to Pet as part of the merger (Depo. of Leaman, p. 42).

By December 7, 1988, Larsen had contributed his $2 million (T.665) required by the agreement to merge. Moreover, Larsen was obligated to lend Kunkel $1.5 million for his contribution. Larsen never lent the $1.5 million (T.105–106, 665). Pet was otherwise ready, willing, and able to perform under the parties' agreement, including the December 1 Letter of Intent (T.666). Pet was willing and able to contribute the assets but did not do so because Larsen withdrew from the merger (T.666). Additionally, Kunkel was willing to infuse $1.5 million into the new venture but did not do so because he never received the money from Larsen (T.667). Kunkel did not otherwise have the ability to put that money into a new entity (T.667), nor did he have the financial wherewithal to pay back the Larsen loan.

The overwhelming evidence shows the $2 million to be a capital investment.

(j) *Inventory Buildup.*

While the financing transactions were going on, there was an inventory build-up at Pet. Within ten days of the September 19 meeting, Carnation canceled its negotiated contract with Pet (T.621). We are not sure if the contract was firm, but a finding to that effect is not necessary to our decision. The Carnation contract was an annual contract for MDB (mechanically deboned beef) (T.745–46). Carnation accounted for one-third of Pet's MDB sales volume (T.819). The cancellation was serious. Kunkel immediately called Larsen about the cancellation because Pet had already committed to purchase the raw materials for the Carnation contract. Kunkel discussed with Larsen his concern that the cancellation would create an inventory build-up of MDB. Larsen told Kunkel not to worry because some negative reaction to the merger could be anticipated. Pet subsequently experienced an inventory build-up of approximately 17 million pounds (T.624–25).

**(k) *Termination of the Venture.***

On December 15, 1988, Larsen and Hurley met with Carnation (T.142–43). Kunkel was aware that Larsen was making this trip, but was not concerned about it. Kunkel believed that Larsen was his partner and that he worked in their mutual best interests. Moreover, Larsen had informed Kunkel that he was going to try and restructure or eliminate the problem Pet was having with Carnation. Kunkel explicitly trusted Larsen to do that. From August through December, 1988, Kunkel trusted and respected Larsen, and was always confident that Larsen would work in their joint interests (T.666–669).

On December 15, prior to Larsen's meeting with Carnation, Sixta met with Larsen and Hurley in Denver (T.932). Hurley told Sixta that the purpose of the Carnation visit was for Hurley, who had been doing business with Carnation for some years, to introduce Carnation to Larsen. It was an attempt to get the Carnation people to trust Larsen (T.933). Larsen told Sixta he was going to visit Carnation to help alleviate the problems or rectify the discontinuation of Carnation's contract with Pet. Larsen had feared that the discontinuation was due to the proposed merger and a threat Carnation might have perceived by the size of the new entity (T.933–934). Larsen was extremely concerned about losing Carnation's business (T.144).

On December 15, Hurley told Sixta that no one in the industry, including Hurley and Larsen, trusted Kunkel and that Kunkel's tenure in the new organization was going to be very short. This came as a surprise to Sixta (T.934–35).

Larsen's representations to Sixta and Kunkel regarding the purpose of the Carnation meeting were false. In fact, at the December 15 meeting with Carnation, Larsen told Carnation that the deal with Pet was not going to fly (Depo. of Hurley, p. 62). It was Hurley's impression that the deal started to unravel around the first of

December, 1988 (Depo. of Hurley, pp. 64–5).

When the December 1 Letter of Intent was executed, Larsen's accountant, Ferdig, had not yet determined Pet's September 30, 1988 book value (T.49). Ferdig completed his review and reconciliation of Pet's books on January 14, 1989 (T.535). At that time, Ferdig's conclusions and recommended adjustments to Pet's books were set forth in a memo [8] to Larsen (T.535–36, 49–50; L.24). Ferdig concluded that approximately $900,000 in adjustments needed to be made to Pet's balance sheet (T.50) to accurately reflect fair value. Larsen was shocked. On November 1 or 2, 1988, however, Larsen had been aware that $500,000 of those adjustments needed to be made (T.70–71).

On January 17, 1989, Larsen and Mulherin flew to Denver to discuss Ferdig's adjustments with Kunkel, Cribari, and Ellis (T.50–51, 508). The parties also discussed Pet's practice of adding a five cent per pound processing charge on inventories (T.51). Sixta and Larsen had previously discussed this practice on December 15, 1988 (T.935–37). The processing charge added to inventory is an accepted accounting practice known as the absorption cost method. It allocates operational and administrative costs to the cost of inventory (T.846) to avoid misstating revenues and expenses between fiscal years (T.984). Because during the relevant time period Pet had increased inventory by approximately 17 million pounds, the inventory write-up, at least in Larsen's mind, overstated Pet's inventory by $800,000 to $900,000 (T.51) over and above Ferdig's adjustments (T.71, 1223–1224).

Larsen also testified that he was shocked by Ferdig's conclusions that some accounts receivable were very old, some in excess of a year. Likewise, this also was discussed at the January 17 meeting (T.51). Larsen knew in early December, 1988, however, that one of the largest receivables on Pet's books was Amarillo Byproducts, that Amarillo Byproducts was in bankruptcy,

**8.** We do not necessarily agree with Ferdig's adjustments, but consider their effect on Larsen

and this transaction.

and that the receivable was quite old (T.72–73).

Based on Ferdig's analysis, Larsen concluded that "there wasn't any or very little book value to" Pet (T.520). Thus, Larsen informed Kunkel that he was backing out of the deal (T.52). Mulherin then said to Kunkel, "Mr. Kunkel, my advice to you is to file bankruptcy, personal bankruptcy, and assign the assets over to us, and we'll find a way to slip you $300,000 or $400,000, and tell the unsecured creditors to go take a flying leap" (T.672, 962–63, 1087). Mulherin told Kunkel that what he proposed was in his best interests (T.673). When Larsen left on January 17, he told Kunkel he would get back to him. Approximately ten days later, Larsen did call Kunkel and expounded on the bankruptcy idea; reiterating that he could slip some funds to Kunkel to live on (T.677). Larsen, with the opportunity to rebut this testimony, never denied it was said. We are not surprised by this testimony, but find it quite compelling.

At trial, Larsen was adamant that he was unaware of Pet's financial condition for the last quarter of 1988. He testified he had repeatedly requested copies of the profit and loss statements (P & L's), but they had not been provided (T.1221, 1226–27). Larsen testified that between November 1, 1988 and January 15, 1989, he discussed Pet's financial condition and books and records with Ferdig and Mulherin (T.138). During this time period, Larsen said he conferred with his accounting and financial advisors, and he was certain that they did not receive any P & L's (T.1227). Dolfay, however, had received a balance sheet and preliminary report for Pet for the period ended September 30, 1988 (CAI.32), which included a P & L for the period ended September 30, 1988 (T.1263). A copy of the September 30, 1988 P & L was maintained in Dolfay's files at Millard (T.1260–64). Additionally, during the fall of 1988, Dolfay, Mulherin, Ferdig, and others continually met with representatives of Pet, reviewed Pet's books and records, and Cribari's files, and reported back to Larsen (T.256). Specifically, when preparing Pet's business plan, Dolfay identified Pet's strengths and weaknesses, and advised Larsen of his findings (T.251–52). Ferdig reported Pet's financial condition to Larsen at least once in November, 1988 and twice in January, 1989 (T.257, 270). Ferdig reported to Mulherin more frequently because Pet was Mulherin's project (T.257–58).

Larsen called Kunkel again in early February and told him he was withdrawing from the merger because he had to look out for his best interests and the merger was not in his best interests (T.678). The alliance between Larsen's and Pet's businesses was unilaterally discontinued by Larsen in February, 1989 (T.789). Larsen started pulling product from Pet (T.849) and Kunkel stopped managing Larsen's plants (T.796). Pet also stopped processing Larsen's product (Depo. of Leaman, p. 62).

Subsequently, Larsen instructed Mulherin to draft and send notices of default to both Pet and Kunkel (T.52). Notices of default were sent on February 15, 1989 (T.53; L.31, 32; T.679–680). Although Mulherin knew that Minor represented Pet, the notices of default were not sent to Minor (T.578–79).

No interest payment had been made on the $2 million note in December, 1988, and thus the note was in default in December (T.64). Likewise, no interest payment was made in January, 1989. Although the note was in default in both December, 1988 and January, 1989, Larsen did not demand payment at that time (T.64).

Larsen never expected that Pet would generate enough cash from its operations between November 28, 1988 and February, 1989 to pay back the note. He believed, however, there was sufficient equity in Pet's Dodge City and Des Moines plants to adequately secure the $2 million (T.135–38).

Three weeks after declaring a default on the $2 million loan, Larsen commenced a lawsuit in the District Court for Polk County, Iowa to collect on the note, and for the appointment of a receiver for Pet's assets in Des Moines. The same actions were taken in the District Court for Ford Coun-

ty, Kansas for the Dodge City facility (T. 1157–58).

In early March, Larsen claimed a warehouse lien in the amount of $155,886.78 on all of Pet's product then in his warehouses, and demanded immediate payment of that amount (CAI.90). Pet later paid the lien amount to Larsen (CAI.91, 92).

The financial condition of Pet in January, 1989 through the middle of February, 1989 was showing signs of improvement as Pet was starting to move inventory and sales were increasing (T.683). Quaker Oats contracted for 12 million pounds of MDB product, and Ralston–Purina came out with a new product that required MDB. The 17 million pounds of inventory that had built-up during the last quarter of 1988 started to move (T.683–84). During January, February, and early March of 1989, Pet was successful in moving its MDB inventory, including that which had been previously rejected (T.955). Customers of Pet, including Spillers in England, Quaker Oats, and Ralston–Purina, were also assisting Pet's cash flow by speeding up their remittance process. Others were ordering substantial quantities from Pet over and above their normal procurement requirements to help Pet (T.907–908).

In mid-February, 1989, Larsen called his major customers and informed them that he was no longer a part of Pet and that he was going to resume his own pet food operations. Among the customers he called were Monfort, Excel Beef, and Beef America. Both Monfort and Excel were also suppliers to Pet. He explained to them that the new company was not going forward and that he would resume doing business as he had in the past (T.140–141).

Shortly after Larsen's calls, Kunkel started receiving numerous phone calls from suppliers and customers including Iowa Beef, Excel, Monfort, Iowa Packers, Carnation, and StarKist (T.680) expressing concern over Pet's financial viability. Additionally, Kunkel heard from C. Muelhaupt, the President of Des Moines Cold Storage (T.680), and lessor to Pet.

Muelhaupt testified that, in February, 1989, Larsen contacted him and told him that although he had merged with Pet and had invested $2 million in Pet, Pet was on the "brink of bankruptcy and it was his intention to try and reclaim the investment that he made" (Depo. of Muelhaupt, pp. 9–11). As part of reclaiming his investment, Larsen said that he was going to take over Pet's Des Moines operation and get possession of Pet's equipment at Des Moines (Depo. of Muelhaupt, pp. 18–19). Larsen also told Muelhaupt that the financial statements of Pet were $1 million off (Depo. of Muelhaupt, p. 21).

Other customers and suppliers who called Pet typically demanded that Pet bring its trade payables current, increase the limits of letters of credit, or requested that Pet go on a COD basis (T.680–83). Excel and Monfort, Pet's two largest suppliers, and Iowa Beef restricted trade credit in this manner (T.939). Smaller suppliers put Pet on wire transfer so that Pet had to prepay for products. All of this occurred in February or March of 1989 (T.940).

On Saturday, March 11, 1989, Kunkel met with Larsen in Omaha (T. 685–86, 73–74). Larsen had heard Pet was having a lot of problems and thus proposed buying the assets and facilities of Pet on which he had a mortgage (T.55). Larsen also told Kunkel that he had made phone calls to Pet's suppliers and customers, including Muelhaupt (Des Moines Cold Storage Co.), Carnation, and StarKist. Kunkel requested that Larsen stop spreading word of Pet's demise. Larsen, however, said he had to protect his own interests (T.686–688).

At the March 11, 1989 meeting in Omaha, Kunkel disclosed and discussed with Larsen that Pet was completing negotiations with Iowa Beef to process all of their pet food. Within a week after conveying this information to Larsen, Iowa Beef canceled their contract (T.799–800). Likewise, during the same conversation, Kunkel disclosed Pet's business dealings with Excel to Larsen. Again, shortly thereafter, Pet lost its contract with Excel (T.799–800).

As a result of the trade credit restriction, Pet required additional funds to keep current, and was able to operate only through

March and April of 1989 (T.684). On May 5, 1989, Pet filed bankruptcy (T.685). Larsen filed proofs of claims in Pet's bankruptcy proceeding in the amounts of $2,115,616.44; $18,735.20; and $7,423.86.

Although there was no direct evidence that Larsen's telephone calls to the industry and his disclosure of Pet's purported financial condition caused Pet's customers to restrict trade credit, cancel contracts, or otherwise not do business with Pet, it is an extraordinary coincidence that every time Larsen called a customer or supplier, they terminated their relationship with Pet. Moreover, Larsen knew that rumor of insolvency would be disastrous to Pet's business. We must therefore infer a direct casual relationship between Larsen's admitted phone calls and the customer/supplier's termination of business with Pet.

## CLAIMS OF THE PARTIES

Larsen sues to obtain a declaratory judgment that a promissory note, related security agreement, guaranty, and other loan documents from various defendants are valid and enforceable. Larsen also seeks a determination about the priority of liens on certain assets of Pet.

All of the party defendants have answered with denials, and raised numerous counterclaims and affirmative defenses. Each has joined in the others' counterclaims and defenses, and each has asserted some counterclaim unique to themselves.

Pet and Protein generally denied Larsen's allegations and affirmatively raised the following:

(a) failure to join indispensable parties;[9]

(b) defendants' signatures on various loan documents was fraudulently induced by Larsen's misrepresentations and omissions;

(c) funds advanced by Larsen represented a capital contribution; not a loan;

(d) fraud;

(e) bad faith;

(f) material misrepresentations;

(g) duress;

(h) acts of omission that induced defendants to sign loan guaranty;

(i) Larsen knew the defendants could not repay the loan;

(j) offset; and

(k) the claims are frivolous and groundless.

In addition to the above joint affirmative defenses, Protein also raised the following affirmative defenses:

(a) latches, estoppel, and waiver;

(b) unclean hands;

(c) failure to mitigate;

(d) unconscionable behavior; and

(e) plaintiff's negligence.

Pet and Protein have asserted the following counterclaims:

(a) breach of fiduciary duty;

(b) intentional interference with contract;

(c) interference with prospective economic advantage;

(d) breach of duty of good faith and fair dealing;

(e) fraud;

(f) civil conspiracy;

(g) breach of contract;

(h) breach of Uniform Trade Secrets Act;

(i) breach of confidentiality agreement;

(j) declaratory judgment;

(k) contribution;

(l) 11 USC § 547(b) preference;

(m) 11 USC § 544(a) lien avoidance;

(n) 11 USC § 548 fraudulent conveyance; and

(o) 11 USC § 510(c) equitable subordination.

The Kunkels have asserted all of the state-based and bankruptcy claims that Pet and Protein have raised, and in addition, Susan Kunkel raised the affirmative defense that her guaranty on the promissory note, dated November 28, 1988, and all other security agreements signed by her relative to her guaranty of that date, are null and void under 15 U.S.C. § 1691.

---

9. This defense was resolved pre-trial.

Larsen has generally denied all the counterclaims and asserted defenses of fraudulent misrepresentation and omission pertaining to the Letter of Intent; impossibility of performance; fraud and unclean hands; estoppel; and, lack of consideration.

There is no easy way to dissect the many failures in this adversary proceeding. Larsen feels he should be vindicated because Kunkel and Kunkel's corporation did not turn out to be what he expected. Kunkel and Pet, in the throes of business expansion, undercapitalized but surviving, pursued by Larsen, felt the failure of bankruptcy. Susan Kunkel saw both her marriage and her home trashed on the rocks of financial failure, and her husband's despair.

The issues are complex. To wind our way through what would be a law professor's dream hypothetical final examination; but what is very real to the parties, we divide our discussion into parts. First, we address the standing of some of the parties to raise certain counterclaims. Second, we discuss the issues, apply the law to the facts, and come to conclusions. Third, we assess the damages.

## DISCUSSION

I. Standing to Bring Certain Causes of Action.

(a) *Pet and Protein.*

▮ Both Pet and Protein have asserted bankruptcy claims against Larsen under 11 U.S.C. §§ 547(b), 544(a), 548, and 510(c). Pet claims its standing to assert these claims arises from its position as debtor-in-possession. Protein asserts its standing derives from an August 14, 1989 order that approved an assignment of contract rights and intangibles including:

all rights of debtor exercisable pursuant to any statute, rule or regulation, choses in action, things in action, claims, demands, defenses to claims (both in law and in equity). The foregoing shall include but shall not be limited to claims for payment or voiding of liens of the Debtor which, as of the date hereof, aris-

ing under any section of the Bankruptcy Code, 11 USC §§ 544, 545, 547, 548, 549. Assignment of Contracts and Intangibles, dated August 14, 1989.

Bankruptcy Judge Brumbaugh, in a related adversary proceeding, *Consolidated Pet Foods, Inc. v. Millard Refrigerated Services, Inc. (In re S & D Foods, Inc.)*, 110 B.R. 34 (Bkrtcy.D.Colo.1990), addressed the standing issue of Pet and Protein to bring Title 11 counterclaims. We adopt Judge Brumbaugh's excellent discussion, and hold that Pet and Protein do not have standing to bring Title 11 counterclaims. Accordingly, the counterclaims of Pet and Protein alleging causes of action under 11 U.S.C. §§ 547(b), 544(a), 548, and 510(c) will be dismissed.

(b) *Donald Kunkel.*

▮ Kunkel has asserted several counterclaims against Larsen. Larsen claims Kunkel is without standing to pursue the majority of his counterclaims because Kunkel is seeking to recover on claims, which, if they exist, belong to Pet or Protein, not to Kunkel. The Colorado Supreme Court has adopted the standing requirements outlined by the United States Supreme Court in *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *Wimberly v. Ettenberg*, 194 Colo. 163, 570 P.2d 535 (1977). In *Data Processing*, the Supreme Court held that two requirements must be satisfied before a party has standing. First, the plaintiff must allege that the challenged action has caused injury in fact and, second, the interest sought to be protected must arguably be within the zone of interest to be protected or regulated by the statute in question. *Id.*, 397 U.S. at 152–53, 90 S.Ct. at 829. Consequently, to pursue a cause of action in Colorado, a plaintiff must suffer an actual injury to a legally protected interest. *See, Wimberly, supra,* 570 P.2d at 539.

▮ It is well settled that an individual cannot maintain an action on its own behalf based on shareholder status in a corporation for alleged wrongs against the corpo-

ration without a showing of injury in some capacity apart from the shareholder status. *See, Green v. Victor Talking Machine Co.*, 24 F.2d 378, 381, 59 ALR 1091 (2d Cir. 1928); *ITT Diversified Credit Corp. v. Kimmel*, 508 F.Supp. 140, 144 (N.D.Ill. 1981); *Box v. Roberts*, 112 Colo. 234, 148 P.2d 810, 811 (1944);. *See also, Artic Contractors, Inc. v. State of Alaska*, 573 P.2d 1385, 1386 (Alaska 1978) (a shareholder has no personal right of action against third parties for acts producing injury to a corporation.). Nor does Donald Kunkel have any greater right to raise Title 11 claims than does Pet or Protein.

▮ As to Kunkel's counterclaims that purport to arise from wrongdoings against Pet, whether based on state law or Title 11, Donald Kunkel has no legally protected interest to support his counterclaims. Accordingly, those counterclaims that allege breach of fiduciary duty, intentional interference with contract and prospective economic advantage, breach of duty of good faith (as this relates to Kunkel's interest in Pet), breach of contract (as this relates to Kunkel's interest in Pet), breach of Uniform Trade Secrets Act, breach of confidentiality agreement, declaratory judgment, and contribution will be dismissed. Our holding does not apply to any claims or defenses arising out of the York, Nebraska; Des Moines, Iowa; or Dodge City, Kansas plants, nor to the claim of civil conspiracy, declaratory judgment, outrageous conduct, or violation of the Equal Credit Opportunity Act.

## II. The Major Issues of Contract.

### (a) *Was there a Contract?*

This is the classic case of the reluctant lover pursued by a relentless suitor, who with the passage of time rethinks the pursuit; such rethinking causing the business deal to fail, placing the marriage of two of the principals on the shoals of divorce, and pushing a closely held corporation into bankruptcy.

The proper place to start is to first determine whether there was an agreement between Larsen and Pet, and if there was, what kind of agreement did they have?

▮ As stated in *Denver Truck Exchange v. Perryman*, 134 Colo. 586, 307 P.2d 805, 810 (1957), "(a) contract is an agreement which creates an obligation. Its essentials are competent parties, [legal] subject matter, ... legal consideration, mutuality of agreement, and mutuality of obligation." Contracts should be construed to give effect to the intent of the parties, *Fort Lyon Canal Co. v. Catlin Canal Co.*, 642 P.2d 501, 506 (Colo.1982), and must be construed as a whole. Effect must be given to every provision if possible. *See, Water Rights v. No. Colo. Water Conservancy District*, 677 P.2d 320, 326 (Colo.1984), *citing, Gandy v. Park National Bank*, 200 Colo. 298, 615 P.2d 20, 22 (1980). Courts, however, possess no authority to rewrite contracts, whether oral or written; but rather, must enforce unambiguous contracts in accordance with their terms. *See, Radiology Professional Corp. v. Trinidad Area Health Association, Inc.*, 195 Colo. 253, 577 P.2d 748, 751 (1978) (*en banc*); *Yamin v. Levine*, 120 Colo. 35, 206 P.2d 596, 597 (1949).

▮ These same rules apply to an oral contract as to one that is partially oral and partially written. The threshold question about whether parties to an oral agreement become bound prior to the drafting and execution of a contemplated formal writing is largely a question of intent on the part of the parties. *Mohler v. Park County School District RE–2*, 32 Colo. App. 388, 515 P.2d 112, 114 (1973), *reh'g denied*, Sep. 5, 1973, *cert. denied*, Nov. 12, 1973. The intent to be bound can be inferred from the parties' actions. *See, Coulter v. Anderson*, 144 Colo. 402, 357 P.2d 76, 79 (1960). Among the factors to be considered are whether there has been an express reservation not to be bound in the absence of a writing,[10] partial performance, agreement to all terms, and whether the agreement is one usually committed to

---

**10.** If it is found that the parties intended to be bound, and some provisions were in writing and some oral, the statute of frauds is not applicable. *Coulter, supra*, 357 P.2d at 81.

writing. *Winston v. Mediafare Entertainment Corporation*, 777 F.2d 78, 80 (2d Cir.1986).

*I.M.A., Inc. v. Rocky Mountain Airways, Inc.*, 713 P.2d 882 (Colo.1986) (*en banc*), *reh'g denied* Jan. 31, 1986, is a factually similar case to the matter *sub judice*. I.M.A., Inc. (IMA) brought suit against Rocky Mountain Airway, Inc. (Rocky) alleging breach of contract between the parties. Unlike Pet, here, IMA was experiencing grave financial difficulties to the extent that it had ceased operations when Rocky expressed interest in acquiring it. The respective company presidents signed a letter of intent (the letter), which stated purpose was to "confirm [the parties'] recent understandings as to the acquisition of the assets of [IMA] by [Rocky]." *Id.*, 713 P.2d at 885. In the letter, IMA represented the value of its assets and liabilities, and updated its accounting records for Rocky's inspection. The parties made no provision for the possibility that the accounting update might show IMA's assets or liabilities to be different from the approximate amounts represented. The letter also stated that the agreement was preliminary in nature. The letter also listed several requirements upon which the transfer was contingent. They included: 1) approval of the transfer by the Public Utility Commission (PUC) and the Civil Aeronautics Board; 2) approval by the respective boards and shareholders; 3) suitable renegotiation of an airport lease, including a list of specified changes; and, 4) ability of Rocky to carry forward IMA's net operating loss.

Subsequent to the signing, an amended letter was executed and several other significant events occurred. IMA leased its PUC certificate of Public Convenience and Necessity to Rocky. The lease included a provision by IMA to assist Rocky in obtaining PUC approval of the lease. Temporary approval was obtained and Rocky began servicing the Denver to Durango air route.

IMA also obtained its shareholders' certification in concept, and its president traveled to Durango, Colorado to build public support for the acquisition. The parties also moved IMA's furniture and office equipment to Rocky's hanger at Denver's Stapleton Airport.

After IMA's books were updated, it was discovered that IMA's liabilities were greater than originally estimated. IMA's president offered to adjust the allocation of the purchase price. But, Rocky decided not to go ahead with the acquisition primarily based on the accounting discovery. Rocky also expressed that market conditions, the existence of two other carriers, and the prospect of deregulation were additional reasons that Rocky had no further interest in the acquisition.

IMA promptly sued, *inter alia*, for breach of contract. A jury verdict was returned in favor of IMA, reversed by the Court of Appeals, which decision was in turn reversed by the Colorado Supreme Court. The Supreme Court held that "when the existence of a contract is in issue, and the evidence is conflicting or admits of more than one inference, it is for the jury to decide whether a contract in fact exists." *I.M.A., Inc., supra*, 713 P.2d at 887. After deciding who should determine whether a contract is formed, *i.e.*, the Court or a jury, the Supreme Court went on to hold, *citing, Coulter, supra*, 357 P.2d at 80, that the mere intention to reduce an oral or informal agreement to writing is not itself sufficient to show that the parties intended that once such formal writing was executed, the parol or informal contract should be without binding force. *I.M.A. Inc., supra*, 713 P.2d at 888. Whether the parties to an oral agreement become bound prior to the drafting and execution of a contemplated formal writing is a question of intent on their part. The intent can be inferred from their actions. *Mohler, supra*, 515 P.2d at 113, *citing, Coulter, supra*, 357 P.2d at 80. *See also, Winston, supra*, 777 F.2d at 80 (to decide intent, a Court must look to the words and deeds of the parties).

*Winston* articulates several factors that help determine whether parties intended to be bound in the absence of an executed document. A Court should consider: (1) whether there has been an express reserva-

tion of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and, (4) whether the agreement at issue is the type of contract that is usually committed to writing. *Winston, supra,* 777 F.2d at 80.

■ Based on the facts of the matter before us, we find that the parties intended to be bound without a formal writing, and that even if that was not their intent, their actions after September 10, 1988 indicate a contract to merge the respective businesses was formed. Thus, we find an oral merger agreement existed as of September 11, 1988, as reflected in the December 1, 1988 Letter of Intent.

We summarize only the major indicia of contract formation. The record is replete with findings to show the parties intended a contract and behaved as if the merger was a *fait accompli.*

First, there was no express reservation. Second, there was substantial performance of all the major provisions. Job responsibilities in the merged entities were redefined. Employees were hired and fired. Plants were closed and sold. Systems and operations were merged. The merger was announced to the world, competitors, and employees. Third, all the major provisions were agreed upon. The detail was to be documented. Even the amount of capital contribution was left fluid. It was an uncertainty as to the amount, but not a condition that would bar the deal. The facts here certainly satisfy most of the *Winston* factors.

One *Winston* factor not completely satisfied is whether this is the type of contract or agreement that is usually committed to a writing. Although our experience as a trier of fact tells us this is the type of contract that is usually committed to a writing, neither party introduced any evidence to either prove or disprove this *Winston* factor. Accordingly, we make no finding in reference to it. Our lack of a

finding on this single factor does not bar a finding that a contract was formed. It is clear that enough of the *Winston* factors are present to warrant our holding that a contract was formed either in fact or by estoppel.

Having found that an agreement was formed either in fact or by estoppel, we now discuss its style.

(b) *Did the agreement to merge result in a Partnership/Joint Venture Agreement or merely a loan?*

Larsen has characterized the events that took place here as a failed merger, and the money lent to Pet and related documents as a loan. Pet says there was a partnership or joint venture, and that the money given to Pet was in the nature of capital.

■ The determination of whether the underlying events *sub judice* result in a partnership is determined by State law. *See, Butner v. United States,* 440 U.S. 48, 54–55, 99 S.Ct. 914, 917–19, 59 L.Ed.2d 136, 141–42 (1979); *In re Black,* 787 F.2d 503, 506 (10th Cir.1986). In Colorado, a joint venture differs from a partnership, but the substantive law of partnership applies. *Beebe v. Schwenn (In re Schwenn),* 126 B.R. 351, 353 (D.Colo.1991); *Hooper v. Yoder,* 737 P.2d 852, 857–858, fn. 4 (Colo.1987) (*en banc*). The major events in the matter at bar took place in Colorado. Accordingly, we apply Colorado partnership law to resolve the question.[11]

■ In Colorado, a partnership is "an association for two or more persons to carry on, as co-owners, a business for profit." C.R.S. § 7–60–106. It is also defined as an express or implied contract between two or more persons to place their money, skill, effects or labor into a business, and to share the profit and losses. No express agreement is necessary. *Grau v. Mitchell,* 156 Colo. 111, 397 P.2d 488, 489 (1964). A partnership may be formed by the conduct of the parties. *Stratman v. Dietrich,* 765 P.2d 603, 605 (Colo.Ct.App.1988), *reh'g de-*

11. In the event this holding is incorrect, there is ample similar case law in Nebraska and Texas

that supports the conclusions we reach.

*nied,* July 14, 1988, *cert. denied,* Dec. 19, 1988; *Yoder v. Hooper,* 695 P.2d 1182, 1187 (Colo.Ct.App.1984). It is not required for a partnership to exist that every partner participate in the day to day management of the partnership business. The management and control of the partnership business may be delegated by agreement, express or implied. *See, Johnson v. Chilcott,* 599 F.Supp. 224, 226–27 (D.Colo.1984). *See also, Peterson v. Massey,* 155 Neb. 829, 53 N.W.2d 912, 916 (1952) (In a joint venture, one party may entrust performance to another.). Finally, if the parties have placed themselves in a relationship that constitutes a partnership, it is not determinative that they call, or do not call, themselves a partnership. *Johnson, supra,* 599 F.Supp. at 227. Rather, whether or not a particular contract or transaction or series of transactions constitutes a partnership must be ascertained by the intention of the parties with reference to the entire transaction, *Dowdy v. Henry (In re Washington Communications Group, Inc.),* 18 B.R. 437, 442 (Bkrtcy.D.C.1982), and not by isolated events. Substance and not name determine the legal relationship. *Seaboard Surety Co. v. H & R Construction Corp.,* 153 F.Supp. 641, 646 (D.Minn.1957), *mod. on other grounds, H.C. Nelson v. Seaboard Surety Co.,* 269 F.2d 882 (8th Cir. 1959). Additionally, a party is estopped to deny the existence of a partnership where that party has executed documents on behalf of the partnership. *Roberts v. Roberts,* 113 Colo. 128, 155 P.2d 155, 157 (1945). But, a financing arrangement does not make a partnership. *Dennis v. Bradbury,* 236 F.Supp. 683, 688 (D.Colo.1964). *See also,* U.P.A. § 7, which sets forth criteria for the consideration of whether or not a partnership has in fact been formed (no inference of a partnership shall be drawn if interest on a loan varies with profits).

■ We conclude that the relationship between Larsen and Pet is either a partnership or joint venture. Our conclusion is mandated by the overwhelming weight of the evidence.

Specifically, we look at the oral agreement to merge. Although it is not clear what the ultimate entity would be (a merged entity, a partnership, a subsidiary of Millard), there was an agreement. But more importantly, we have the express representations of Larsen about a partnership, the later sharing of equipment, employees, and product, joint discussions usually arrived at in consultation but always based upon the utmost trust and confidence, joint sales calls, public announcements about the merger (and later, Larsen's unilateral announcement that the deal was over). These facts show a *de facto* partnership or certainly one by estoppel. Finally, we have Larsen's own testimony that the pet food operations had merged.

■ In spite of this evidence, Larsen tried to sway our view about the $2 million given to Pet. There is no doubt an isolated view of the notes, guarantees, and loan documents would lead a fact finder to conclude a loan and not a capital investment was had between the parties. The Parol Evidence Rule normally prevents the introduction of evidence about what appears to be integrated and complete agreements. *See, Sherman v. Sprentall,* 709 P.2d 602, 603 (Colo.Ct.App.1985). *See also, Restatement of Contracts,* Second, § 213. But the exceptions to the Parol Evidence Rule are many and as varied as the rule itself. *See, e.g., Burenheide v. Wall,* 131 Colo. 371, 281 P.2d 1000, 1002 (1955) (*en banc*); *Metro National Bank v. Roe,* 675 P.2d 331, 332 (Colo.Ct.App.1983); *Simpson v. Milne,* 677 P.2d 365, 368 (Colo.Ct.App.1983), *reh'g denied* August 25, 1983, *cert. denied,* Feb. 6, 1984; *Restatement of Contracts,* Second, § 214. Specifically, and as here, where the question raised as to the purpose of the promissory note is between the maker and the payee and its substantive effect, the rule must give way.

■ The evidence presented on the views of the parties about what the $2 million represents, when first examined, appears hopelessly contradictory. But deboning the facts shows the $2 million was meant to be a capital infusion.

Larsen's employees thought it was a capital transaction. In spite of the clear import of the documents, the transaction was

booked in Millard's accounting records as an investment and not a loan. Larsen's later accounting treatment of the $2 million as a loan does not metamorphically transform the transaction. In fact, the accounting "reclassification" struck us as a rather self-serving admission. Neither Larsen nor his agents did a credit check to see if Kunkel or Pet could repay the loan. This was a strange omission on the part of a person who in our view is a savvy business person. Mulherin assured Kunkel the loan was only to protect Larsen in case something happened to Kunkel—an audit trail, so to speak. Larsen knew Pet couldn't repay the money lent in 90 days. Larsen knew Kunkel had expressed concern about repaying the money, but possibly didn't know for certain that Kunkel couldn't repay. Most compelling is that Miller of Columbia Savings and Loan understood from Mulherin that the money was capital. Equally compelling is that Mulherin knew various loan documents that Pet had with Columbia restricted new borrowing, and that a loan would put Pet in default with Columbia. Kunkel's later efforts to repay the $2 million does not prove the money was a loan. Rather, it showed the integrity of the man. Nor does the fact that Pet's accounting personnel treated the $2 million as a loan sway us from the overall conclusion that the money was capital. They apparently did not receive any instruction from Kunkel on how to book the transaction. They took it at face value. Unlike Larsen's personnel, who appeared to be fully informed, Pet's personnel, without more information, could not have handled it differently.

Lastly, it is no coincidence that the $2 million is equal to the amount of funds Larsen had agreed to invest in the merger. It logically follows from our finding that the $2 million represents a capital investment and not a loan; that the promissory notes, security documents and interest, related agreements, assignments, and mortgage are null and void *ab initio*. Accordingly, we resolve Larsen's request for declaratory judgment by ruling against him, and declaring the $2 million to be a capital infusion and not a loan.

(c) *Was there a fiduciary or confidential relationship under Colorado law?*

Having found that a partnership or joint venture existed, we also find that a fiduciary or confidential relationship existed by virtue of the partnership or joint venture.

■■■■ The fiduciary duties owed by partners and joint ventures include the duties of loyalty, honesty and candor, good faith and fair dealing, and lack of self-dealing. *See, Brunner v. Horton,* 702 P.2d 283, 284 (Colo.Ct.App.1985); C.J.I.2d, ¶ 31:16. *Compare, Kincaid v. Miller,* 129 Colo. 552, 272 P.2d 276, 281 (1954) (*en banc*), *reh'g denied,* July 19, 1954. The same can be said for parties to any of the above mentioned relationships of trust and confidence to each other. All parties to such relationships are bound by the highest standards of good conduct and fair dealing. Thus, without the consent of the other parties, no party to a fiduciary or confidential relationship may pursue his own personal interest in a way that is hostile to the interest of another party so long as the relationship continues. *See, Kincaid, supra,* 272 P.2d at 281. Moreover, a fiduciary duty can form during the negotiations that precede the formal execution of a written agreement. *Lucas v. Abbott,* 198 Colo. 477, 601 P.2d 1376, 1379 (1979) (*en banc*). *See also, Fitz–Gerald v. Hull,* 150 Tex. 39, 237 S.W.2d 256, 264–65 (1951). Thus, during negotiations, each party to a future or potential fiduciary relationship has a duty to make full disclosure to the other parties concerning matters that have induced them to enter into the relationship. *See, Lucas, supra,* 601 P.2d at 1379, *citing, Taylor v. Jackson,* 267 Or. 33, 514 P.2d 548 (1973). Finally, fiduciary obligations continue after dissolution of a partnership or joint venture and until all partnership or joint venture affairs are completely wound-up. *See, Hooper v. Yoder, supra,* 737 P.2d at 859. *See also, Steeby v. Fial,* 765 P.2d 1081, 1084 (Colo.Ct.App.1988). We hold that this same rule of law applies to confidential relationships. Thus, a partner, joint venturer, or one in a dissolving confidential relationship, which still has loose ends dan-

gling, cannot cut-off the rights of the other partner in the dissolved relationship by the tactic of entering into a "new" contract to complete such business. *Id.; Rosenfeld, Meyer & Susman v. Cohen*, 194 Cal.Rptr. 180, 190, 146 Cal.App.3d 200, 218 (1983), *hrg denied* Nov. 9, 1983. Nor may a party in a fiduciary or confidential relationship interfere with current or prospective contracts or business relations of the other parties to the relationship.

### (d) *Was there a Confidentiality Agreement?*

No party disputes that there was a confidentiality agreement between the parties. That agreement created a confidential relationship between the parties, and is thus a distinct basis upon which to find such a relationship, even apart from the partnership/joint venture.

Having found there was a contract, a confidentiality agreement, a partnership or joint venture, and a confidential relationship, we now discuss if there was a breach of any or all of them.

### (e) *Was there a breach of the Joint Venture Contract and of the Confidentiality Agreement?*

 The elements of a breach of contract cause of action are:

a) the existence of a contract;

b) the failure of performance that was promised; and,

c) damages.

 We conclude without reservation that Larsen breached the oral merger agreement of September 11, 1988, as reflected in the December 1, 1988 Letter of Intent.

As we have previously found, the oral merger agreement, as documented in the Letter of Intent is an enforceable contract. The oral merger agreement and the December 1, 1988 Letter of Intent are unambiguous. They must be enforced according to their terms. *Radiology Prof. Corp. v. Trinidad Area Health Assn, Inc.*, 195 Colo. 253, 577 P.2d 748, 751 (1978) (*en banc*). Thus, Larsen was obligated to in-

fuse $2 million of capital into Pet, rather than lend, as Larsen claims. Additionally, Larsen was required to lend Kunkel $1.5 million to contribute to the new entity. Kunkel and Pet were at all times ready, willing, and able to perform their obligations to the new entity. Larsen, by his failure to lend the $1.5 million to Kunkel, as well as his numerous other breaches, prevented the performance of Kunkel and Pet. Under Colorado law, if one party's performance under a contract is prevented by another party to the contract, the party prevented from discharging the required obligation is to be treated as though the party performed. See, *American Industrial Leasing Co. v. Costello*, 160 Colo. 588, 418 P.2d 881, 886 (1966) (*en banc*); *Smith v. Roe*, 7 Colo. 95, 1 P. 909, 911 (1883). Stated another way, when one party is prevented from fully performing a contract by the fault of the other party, the latter cannot be allowed to take advantage of the wrong and escape liability under the contract.

Thus, Pet must be treated as having performed. Larsen's request for declaratory judgment must be denied. Damages from Larsen's breach of the two contracts will be discussed later.

 We also find that Larsen breached the Confidentiality Agreement. Under it, Larsen promised not to disclose certain confidential or proprietary information of Pet, including customer lists, pricing information, and other business information. Larsen and his agents and employees obtained this information through their review of Pet's books and records, conducted as a result of the Confidentiality Agreement and the confidential relationship we have found between all the parties.

The evidence is clear that in February and March of 1989, Larsen made numerous contacts via telephone and in person to Pet's customers and suppliers, and disclosed confidential information obtained as a result of the Confidentiality Agreement and the confidential relationship. Specifically, Larsen informed all customers and suppliers of Pet that Pet was in financial trouble, its accounting records were not

accurate, its inventory was overstated, Kunkel could not be trusted, and that Pet was on the brink of bankruptcy. The evidence shows this was done willfully and wantonly, with the intent to ensure Larsen ended up with Pet's assets.

(f) *Was there a breach of fiduciary duty?*

■ To recover for breach of fiduciary duty in Colorado, a party plaintiff must show:

(1) The defendant and plaintiff were in a fiduciary relationship;

(2) The defendant breached a fiduciary duty owed to the plaintiff;

(3) The plaintiff incurred damages or losses; and,

(4) The defendant's breach of fiduciary duty was a cause of the plaintiff's damage.

*See,* C.J.I.2d, ¶ 26.1.

■ We find that Pet has proven all the elements for breach of fiduciary duty under Colorado law. We also hold that such breach gives rise to constructive fraud under Colorado law. See, *Security National Bank v. Peters, Writer and Christensen, Inc.,* 39 Colo.App. 344, 569 P.2d 875, 880–881 (1977), *reh'g denied,* June 30, 1977, *cert. denied,* Sept. 12, 1977 (Constructive fraud is "a breach of duty, which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive [and] violate confidence.... Neither actual dishonesty nor intent to deceive is an essential element of constructive fraud."). A fiduciary duty creates fiduciary obligations as a matter of law. See, *Alexander Co. v. Packard,* 754 P.2d 780, 782 (Colo.Ct.App.1988). The Confidentiality Agreement, as a matter of law, also created a fiduciary or confidential relationship between Larsen and Pet. The evidence is ample to show that as a result of the fiduciary and confidential relationship, Pet reposed trust and confidence in Larsen. After signing the confidentiality agreement, Pet disclosed confidential information and production mechanisms, and provided full and complete access to Pet's books and records, access to Cribari's working papers, and access to bank contracts and records. Kunkel clearly reposed trust in Larsen and his agents showing a fiduciary and/or confidential relationship.

(g) *Was there a breach of the Partnership or Joint Venture relationship?*

■ There is ample evidence to support a conclusion that Larsen breached the fiduciary duties owed Pet and Kunkel under their agreement. Specifically, we find:

(1) Larsen disclosed confidential information.

(2) Larsen engaged in self-dealing by associating with Kunkel and Pet to increase his own warehouse business by taking over the York and Des Moines storage facilities.

(3) Larsen's actual (discussed in Section IV. below) and constructive fraud constituted a breach of fiduciary duty.

(4) Mulherin's actions and representations concerning the November 28, 1988 documents, all of which may be imputed to Larsen because Mulherin was Larsen's agent, breach duties of honesty, good faith, loyalty, and fair dealing.

(5) By sending default letters, and instituting lawsuits for appointments of a receiver at Pet's Des Moines and Dodge City facilities, Larsen breached a fiduciary obligation.

(6) The disclosure to Carnation on December 15, 1988 about the deal between Larsen and Pet being off, without disclosure to Pet, was a breach of candor.

(7) Suddenly withdrawing from the joint venture or partnership on pretextual grounds was a breach.

(8) The imposition of the warehouse lien on Pet's products, and the acceptance of payment for same was a flagrant action in Larsen's self-dealing, in violation of his fiduciary duties.

(9) Suggesting that Pet file bankruptcy and that Larsen would "slip" money

to Kunkel violated a duty of fair dealing.

(10) Larsen's February and March, 1989 telephone calls to Pet's customers and suppliers about Pet's financial condition was a breach of fiduciary duty and one of the principal reasons for Pet's bankruptcy.

■ Proof of harm from a breach of fiduciary duty entitles an injured party to whom the duty was owed to damages that:

(a) place the injured party in the same position it would have been in but for the fiduciary breach;

(b) place the non-breaching party in the position the party was in before the breach; and,

(c) equal any profit the breaching fiduciary made as a result of committing the breach.

See, *Restatement of Trusts*, Second, § 2205, Comment A, at p. 458 (1957); *Hudson v. American Founders Life Ins. Co.*, 151 Colo. 54, 377 P.2d 391, 395 (1962) and § 15–1–103(2), (3), C.R.S. (1987); *Kane v. McNally*, 470 P.2d 73, 76 (Colo.Ct.App. 1970), *reh'g denied*, Feb. 19, 1970, *cert. denied*, May 12, 1970; *Ramsay v. Meade*, 37 Colo. 465, 86 P. 1018, 1020 (1906).

■ As a result of Larsen's numerous and varied breaches of his fiduciary duty, and his complete lack of candor and deceptive conduct, both individually and through his corporate agents and employees, Pet suffered damages consisting of (1) the $155,886.78 paid on the warehouse lien, (2) the execution of the November 28 loan and security agreement to its detriment, and (3) the ultimate demise of Pet's business.[12] The $155,886.78 must be repaid. The loan and security agreements are of no effect. They are not what they purport to be. See, *Damrell v. Creagar*, 42 Colo.App. 281, 599 P.2d 262, 264 (1979), *reh'g denied*, May 10, 1979, *cert. denied*, Aug. 20, 1979 (validity of a lien must be ascertained in light of a plaintiff's status as a partner.).

We also conclude that Larsen's conduct was willful, wanton, and intentional *vis a vis* his fiduciary duties.

12. We will discuss damages in Section V. below.

(h) *Is Pet entitled to contribution from Larsen for debts paid both before and during the pendency of Pet's bankruptcy?*

■ All parties are liable, jointly and severally, for everything chargeable to the partnership under §§ 7–60–113 and 7–60–114 (C.R.S.), and are jointly and severally liable for all other debts of the partnership. C.R.S. § 7–60–115 (1990); Article 60, *Uniform Partnership Law.*

A claim for contribution is predicated on the existence of a partnership or joint venture. We have found such a relationship exists, by whatever name, between Larsen and Pet.

■ Ordinarily, a partner is not entitled to contribution until after a settlement showing the respective equities of the parties. *Goff v. Bergerman*, 97 Colo. 363, 50 P.2d 59, 61 (1935), *reh'g denied*, Oct. 21, 1935. Contributions may be allowed without a previous settlement of firm accounts when the item has been separated from partnership affairs. *Keefer v. Valentine*, 199 Iowa 1337, 203 N.W. 787 (1925). Colorado has allowed a contribution action without a formal accounting. *Boner v. L.C. Fulenwider, Inc.*, 32 Colo.App. 440, 513 P.2d 730, 732 (1973). *See also*, 68 C.J.S. *Partnership*, § 116 (1950); C.R.S. 7–60–134; 1 *Colorado Methods of Practice*, § 149 (Rev.3d Ed.1989).

■ Here, United Protein, as part of the agreement to purchase Pet's assets, has agreed to pay 50% of the unsecured unpaid trade debt of Pet, not to exceed $2.5 million. Larsen, as Pet's partner or joint venturer, is obligated to pay 50% of $1.25 million as his contribution share.

III. Issues Pertaining to Interference with Contract and Prospective Economic Advantage.

All the defendants have raised counterclaims of interference with contract and

with prospective advantage.[13] These torts have been recognized only recently, with the tort of interference with contract recognized in the leading modern case of *Lumley v. Gye,* 2 El. & Bl. 216, 118 Eng. Rep. 743 (Q.B.1853). A further extension of the tort of interference with a present economic right to that of interference with prospective economic gain was first reported in *Temperton v. Russell,* 1 Q.B. 715 (1893). Both torts protect relational interests. We discuss them together because they are close cousins in the law.

▮ Colorado requires five specific elements before it will recognize the tort of intentional interference with the performance of an existing contract with a third person. They are:

(1) existence of a valid contract between plaintiff and a third party;

(2) knowledge by the defendant of this contract, or knowledge of facts that should lead (a party) to inquire as to the existence of the contract;

(3) intent by the defendant to induce a breach of contract by the third party;

(4) action by the defendant that induces a breach of contract; and,

(5) damages to the plaintiff.

*Control, Inc. v. Mountain States Telephone and Telegraph Company,* 32 Colo. App. 384, 513 P.2d 1082, 1084 (1973). *See also, Restatement of Torts,* Second, § 766; *Memorial Gardens, Inc. v. Olympian Sales and Management Consultants, Inc.,* 690 P.2d 207, 210 (Colo.1984) (*en banc*), *reh'g denied,* Nov. 26, 1984 (*citing,* the *Restatement* with approval).

The first element of the tort of intentional interference with a contract with a third person is the existence of a valid contract between a plaintiff and a third party. The basic importance of this element was recognized in *William v. Burns,* 540 F.Supp. 1243, 1251 (D.Colo.1982). There, a defendant's motion for summary judgment was granted because the plaintiff failed to allege or present any evidence of an existing contract. *Id.,* at 1251.

The second element of the tort is that the defendant had knowledge of a contract or knowledge of facts that lead the defendant to inquire as to the existence of a contract.

▮ The third element of the tort is intent. It is a difficult issue to prove. Rare is the defendant who will directly admit intent. Thus, this element, essentially a factual one, may be proven by circumstantial evidence.

The fourth and final element besides damages is that the defendant must act in such a way that induces or causes nonperformance of the contract. *Restatement of Torts,* Second, states the tort requires that the defendant's action be intentional and that it improperly interferes with the performance of a contract. Specifically,

[i]n determining whether an actor's conduct is intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:

(a) the nature of the actor's conduct;

(b) the actor's motive;

(c) the interest of the other with which the actor's conduct interferes;

(d) the interest sought to be advanced by the actor;

(e) social interest in protecting the freedom of actions of the actor and the contractual interest of the other;

(f) proximity or remoteness of the actor's conduct to the interference; and,

(g) the relations between the parties.

*Restatement of Torts,* Second, § 767 (1979).

▮ The tort of interference with prospective[14] advantage is different from interference with contract because the former looks to protect future valuable ex-

---

**13.** We indicated, *supra,* at pp. 155–56 that the Kunkels have no standing to bring this counterclaim.

**14.** For those versed in New York law, the tort is often referred to as a "prima facie" tort. *See,*

*Rager v. McCloskey,* 305 N.Y. 75, 111 N.E.2d 214, 217 (Ct.App.1953). *See also, Restatement of Torts,* Second, § 766(B).

pectancies, while the latter is to protect what has already been acquired. The difficulty with the tort is the burden of proving damages. While prospective damages is a familiar element in a breach of contract case, nevertheless, it is a burden that is difficult to prove.

A breach of confidence committed or induced in obtaining or using a trade secret has been a frequent ground for relief. § 130, "Interference with Prospective Advantage," *Prosser and Keeton on the Law of Torts* (5th ed. 1984).

The tort has been recognized in Colorado in the case of *Montgomery Ward & Co., Inc. v. Andrews*, 736 P.2d 40, 47 (Colo.Ct. App.1987), *reh'g denied*, Mar. 19, 1987 (*quoting, Restatement of Torts*, Second, § 766(B)). *Andrews* states the elements of the tort to be:

(a) inducing or otherwise causing a third person not to enter into or continue a prospective relation; or,

(b) preventing the other from acquiring or continuing the relation.

*Id.* at 47. *See also, Dolton v. Capitol Federal Savings and Loan Association*, 642 P.2d 21, 23 (Colo.Ct.App.1981) *reh'g denied*, Oct. 8, 1981, *cert. denied*, Mar. 8, 1982.

 To prove the tort, it is not necessary to prove an underlying contract. It is sufficient to show intentional and improper interference preventing formation of a contract. *Dolton, supra*, 642 P.2d at 23, *citing, Restatement of Torts*, Second, § 766(B). Finally, and although not clearly articulated in *Dolton*, it would appear that Colorado accepts that a breach of fiduciary relationship can give rise to the tort, because the nature of the relationship, business or confidential, may impel or induce a party to relax the care and vigilance a person would and should have ordinarily exercised in dealing with a stranger. *Id.*, at 23. It is patently clear that Colorado requires improper conduct before it will recognize the tort.

 We find that Larsen has committed both torts claimed by Pet. In mid-February, 1989, Larsen called his and Pet's major customers and informed them that the deal with Pet was not going through. Shortly after Larsen's calls, Kunkel began receiving calls about Pet's financial viability. Other customers started demanding COD payments. Others restricted credit. The record is replete with constructive, if not actual, interferences with current and prospective customers. The coincidence of Larsen's contacts with the direct results obtained is too extraordinary for us not to reach a conclusion the torts have been committed. Moreover, there was clearly a revelation by Larsen to others about Pet's financial condition. This is the revelation of a trade secret, and is actionable under the tort of interference with prospective advantage. Finally, it appears that Larsen used his newly found trade secrets to get Iowa Beef to cancel its negotiations with Pet in March of 1988.

What are the damages Pet suffered? Clearly, the cancellations of business and tightened credit contributed to Pet's slide into bankruptcy. No exact amount can be determined to this specific tort; however, the commission of these torts caused overall harm to Pet. Thus, we will have more to say about damages when we reach that part of our discussion.

IV. Fraud, Misrepresentation, Nondisclosure, and other Torts.

(a) *Fraud, Misrepresentation, and Nondisclosure.*

Pet claims that Larsen committed actual fraud upon Pet and is liable for damages. Pet has also raised affirmative defenses of material misrepresentation and acts of omission.

 The elements of common law deceit have been well established for over 50 years in Colorado since the case of *Morrison v. Goodspeed*, 100 Colo. 470, 68 P.2d 458 (1937). The elements are:

(1) false representation of a material fact;

(2) knowledge on the part of the one making the representation that it is false;

(3) ignorance on the part of the one to whom the representation is made of the facts of the representation;

(4) representation made with the intention that it be acted upon; and,

(5) action on the representation resulting in damage.

*Id.* 68 P.2d at 462. One remedy for fraud or deceit is rescission and restitution. The contract or matter involved is voidable.

The law of misrepresentation is considerably broader than the separate tort action for fraud. The law of misrepresentation seems to first appear in the early English case of *Pasley v. Freeman*, 3 Term Rep. 51, 100 Eng.Rep. 450 (1789).[15]

Misrepresentation arises when it is fixed as a defense to an action; as here, when Pet claims it was induced by false statements to sign a promissory note, security agreements, and guarantees. In earlier law, it was known as fraud in the *factum*. In modern law, we have broken it down into fraud in the inducement, and fraud in the execution. U.S. District Judge Kane, now Senior Judge, has succinctly described the difference between the two subsets of misrepresentation in *Colorado Plasterers' Pension Fund v. Plasterers' Unlimited, Inc.*, 655 F.Supp. 1184 (D.Colo.1987).

> Fraud in the inducement consists of inducing one by some fraudulent representation or pretense to execute the very contract to be executed. An agreement based on such an inducement is voidable. Fraud in the inducement has three requirements: first, the misrepresentation must have been either fraudulent or material; second, the misrepresentation must have induced the recipient to make the contract; third, the recipient must have been justified in relying on the misrepresentation. If each of these elements is met, the contract is voidable. Fraud in the execution, on the other hand, occurs if a "misrepresentation as to the character or essential terms of a proposed contract induces conduct that appears to be a manifestation of assent by one who neither knows nor has a reasonable opportunity to know of the character or essential terms of the proposed contract." If the elements of the defense of fraud in the execution are met, the contract is not merely voidable, it is void *ab initio*.

*Id.* at 1186. (Citations omitted).

That there is deceit and misrepresentation involved in this case is beyond peradventure of a doubt. When it began, however, and what type of misrepresentation occurred, is not easily ascertained.

■ Pet and the other defendants would like us to find that Larsen had the scienter from day one to take over Pet, and that Larsen never disclosed this intent. The evidence belies this. Larsen is a savvy and smart businessman. The record clearly reflects the synergistic results a combination of Larsen and Pet's businesses would bring. Although the form of the deal would probably leave the CPF–MRF corporation a related entity within Larsen's family of corporations, and Kunkel, a soldier within the family, this result is not necessarily a fraudulent one. Here, we give Larsen the benefit of the doubt. But, sometime between August and November, 1988, this benefit of the doubt changes. Somewhere within this period of time, the precise moment being unknowable, Larsen assumed an intent to bolster his own warehouse business to the detriment of Pet, and to force Pet to sell its competing cold storage facilities in York and Des Moines to Larsen at a distressed sales price. This intent was clearly visible when, on November 28, 1988, Larsen failed to disclose his intent to consider the $2 million given to Pet as a loan, and that he (Larsen) would enforce the security documents and call a default on the loan when it became due. Moreover, it is patently clear that Mulherin, Larsen's agent, affirmatively misled Donald Kunkel, Pet's agent, about the import of the documents. Additionally, Mulherin affirmatively misled Kunkel about Attorney Minor's involvement (or lack of involvement), and did the same to

---

**15.** This is not to say it didn't exist earlier in our common law heritage. *See,* 1 Street, *Foundations of Legal Liability,* at 376 (1906) (Writ of deceit known to exist as early as 1201 A.D.).

Minor. We also find that Dolfay quietly understood what was happening on November 28, 1988, in that he knew the import of the documents. Thus, all of the elements of *Goodspeed, supra,* 68 P.2d at 462, are satisfied.

■ In addition, we find that there was fraud in the inducement when Kunkel signed the documents because Larsen, via his agent Mulherin, knew Kunkel trusted him and that Kunkel placed the utmost confidence in him when he signed the documents. Even after Kunkel questioned the documents, he was twice mislead by Mulherin. This behavior was especially outrageous and egregious because Mulherin knew Kunkel would rely on him (to Pet's detriment).

■ Finally, we find there was also fraud in the execution. Mulherin, an attorney, prevented Kunkel from consulting with Pet's attorney, whose existence Mulherin was aware of; and at the signing, Mulherin prevented an effective review by Kunkel of the documents. Although we find Kunkel should have reviewed the documents more carefully, the fiduciary and confidential relationship between the parties justifies his behavior and vilifies Larsen's.

■ Because common law fraud and misrepresentation has been shown,[16] Pet is entitled to recover all actual, incidental, or consequential damages that are the natural and proximate result of Larsen's fraudulent conduct. Pet is also entitled to rescind the $2 million promissory note, security agreements, and loan guarantees. Finally, because Larsen's conduct was willful and wanton, and exercised business decorum we cannot condone, Pet is entitled to exemplary or punitive damages. C.R.S. § 13–21–102. Damages are discussed below.

(b) *Civil Conspiracy.*

Pet has alleged the existence of a civil conspiracy against it by Millard and Larsen, specifically that Larsen conspired to acquire the control of Kunkel's interest in Pet.

The tort of civil conspiracy can be defined as "an intentional tort that requires proof of a combination between two or more persons to accomplish an unlawful goal or a permitted goal unlawfully." *Hawkinson v. A.H. Robbins Co., Inc.,* 595 F.Supp. 1290, 1314 (D.Colo.1984). *See also, Mulei v. Jet Courier Service, Inc.,* 739 P.2d 889, 894 (Colo.Ct.App.1987), *rev'd on other grounds,* 771 P.2d 486 (Colo.1989) ("{A} party cannot be held liable merely for doing in a proper manner that which it had a lawful right to do.").

■ Civil conspiracy requires a showing, by a preponderance, of five elements:

1) two or more persons;

2) with an object to be accomplished;

3) with a meeting of the minds on the object or course of action to be accomplished;

4) with one or more unlawful overt acts (*i.e.,* an unlawful purpose or a lawful purpose accomplished by unlawful means); and,

5) damages as a proximate result thereof.

*Contract Maintenance Co. v. Local No. 105, Building Service Employees Int'l Union,* 160 Colo. 190, 415 P.2d 855, 856 (1966) (*en banc*); *Spears Free Clinic and Hospital v. Denver Area Better Business Bureau,* 135 Colo. 464, 312 P.2d 110, 112 (1957) (*en banc*). *See also, Lockwood Grader Corp. v. Bockhaus,* 129 Colo. 339, 270 P.2d 193, 196 (1954) (*en banc*) (Proof needed for a conspiracy.).

■ A conspiracy is difficult to prove with direct evidence because it is rare that parties to a conspiracy will testify to it. We hold that the actions must fail because missing here is the requisite second party. Not one defendant here has named any other party to this suit as a co-conspirator.

---

**16.** This burden of proof has been carried by clear and convincing evidence. We are aware that the burden in Colorado is by a preponderance of the evidence. C.R.S. § 13–25–127 (1987).

(c) *Breach of Uniform Trade Secrets Act.*

 Pet claims that Larsen breached the Uniform Trade Secrets Act, C.R.S. §§ 7–74–101, *et seq.* Misappropriation of a trade secret occurs if:

1) a trade secret is disclosed;

2) without the express or implied consent of the owner;

3) by a person who knew or had reason to know that the knowledge obtained was a trade secret;

4) the knowledge obtained was acquired under circumstances that give rise to a duty to maintain secrecy or limit its use; and,

5) the use or disclosure of the trade secret must be detrimental to the party whose secret is revealed.

*See,* C.R.S. § 7–74–108.

 There is no Colorado law interpreting the statute. Trade secrets include "confidential business or financial information," that the owner has "taken measures to prevent the secret from becoming available to persons other than those selected by the owner to have access." C.R.S. § 7–74–102(4). What constitutes a trade secret is generally a question of fact. An agreement not to disclose confidential information is an acknowledgement that the information is a trade secret. *Kodekey Electronics, Inc. v. Mechanex Corporation,* 486 F.2d 449, 455 (10th Cir.1973).

 Another element of a trade secret is its secrecy and value. To succeed on a violation of the Trade Secrets Act, a party must show that a prospective competitor would have been required to expend money and time to produce a comparable process or develop comparable information.

 Another element of a trade secret is that it is not generally known. Matters that are generally known, or which are commonly known, in a trade or business cannot be considered trade secrets. *See, Surgidev Corp. v. Eye Technology, Inc.,* 648 F.Supp. 661, 681 (D.Minn.1986), *aff'd,* 828 F.2d 452 (1987).

 It is clear that Larsen disclosed trade secrets of Pet to suppliers, customers, and canneries in the pet food industry, thus violating the Uniform Trade Secrets Act. Specifically, Larsen disclosed Pet's financial condition, and announced that Pet was on the brink of bankruptcy. While it is true that this information may have been generally known, the knowledge may have been as a result of Larsen's disclosure. Most compelling, is that Larsen knew he had acquired Pet's secret and confidential business information under circumstances that implied a duty on Larsen to maintain their secrecy. The evidence is inconclusive, however, as to whether Larsen revealed trade secrets about Pet freezer processes. Finally, Pet is entitled to recover attorney's fees, costs, and exemplary damages, because we find that Larsen's revelations to others about Pet's trade secrets were so malicious and wanton. C.R.S. § 7–74–104(2); § 7–74–105. Exemplary damages are determined to be ten (10%) percent of Pet's entire recovery herein.

V. Damages—Pet.

 During the trial, we heard the testimony of defendants' experts, Pattern and Banbury, with reference to the value of Pet at the time of the subject transaction.

Banbury put a mid-range value on the stock of Pet at $21 million. Banbury also had a high and low value that was $15 million and $31 million respectively (T.1142). Deducted from these amounts was the corporate debt of $9.6 million (CAI.119), as well as the contingent debt upon which we can make no finding due to lack of evidence.

In taking into account all the evidence, we do not have to embrace every bit of evidence that an expert provides. What rings clear from both the experts and the parties themselves is that both Larsen and Kunkel were looking to the long-term benefit of their business marriage and not a short-term gain. We find Banbury's mid-range value for Pet to be the most persuasive value. Thus, the damages for Pet's losses are $11,400,000 ($21,000,000

minus $9,600,000), and not the $4 million the parties agreed was the entry price. The latter being a short-term price.

## VI. Kunkel's Claims.

### (a) *Fraud in the Inducement and Execution.*

 In addition to our previous findings, *supra*, we find that Larsen, by himself, and his agents,[17] fraudulently obtained the signatures of Susan L. Kunkel and Donald A. Kunkel upon a $2 million promissory note and certain security agreements.

The signatures were obtained by misrepresentation about the nature of the documents, and the fact that the loan was never one that was meant to be a legally enforceable debt. *McCaffrey v. Mitchell*, 98 Colo. 467, 56 P.2d 926, 929 (1936). Moreover, the physical circumstances under which the documents were signed support rescission on the grounds of fraud in the execution. Additionally, punitive and exemplary damages are appropriate. Our holding here also supports a finding in reference to Kunkel's request for declaratory judgment.

### (b) *Civil Conspiracy to Acquire Kunkel's Interest in Pet.*

This claim cannot stand for the same reason stated in our discussion about Pet's cause of action on this issue.

### (c) *Outrageous Conduct.*

 To recover upon a claim of outrageous conduct, a party must show by a preponderance of the evidence:

1) extreme and outrageous conduct;

2) conduct recklessly, or with the intent of, causing severe emotional distress; and,

3) conduct resulting in severe emotional distress.

*Rugg v. McCarty*, 173 Colo. 170, 476 P.2d 753 (1970).

Extreme and outrageous conduct has been defined as conduct

so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Restatement of Torts*, Second, § 46 (1965).

 Having examined the evidence in this proceeding, and in particular the actions of Mulherin, Larsen's agent, and Larsen's actions in conjunction with Mulherin, we find that while it was represented to the Kunkels that the promissory note and supporting documents were to be "stop-gap" measures with no intention to enforce them, these representations were contrary to Larsen's intentions. We find these representations induced Kunkel to induce his spouse to sign the documents. In reviewing Mulherin's conduct misleading Kunkel and Minor, we find Mulherin's actions beyond any possible pale of decency and ethical responsibility imposed on an attorney in his position. Moreover, Mulherin's conduct in not forwarding any of the documentation to Kunkel's attorney for review, both prior to and after the closing, was not only unwarranted, but also outrageous.

Mulherin's representation to Kunkel, when Kunkel became apprehensive about signing the documents, were deliberately calculated to take advantage of the position of faith and trust that Kunkel had in Larsen and Mulherin. Further, Mulherin's lie to Kunkel that he had spoken to Minor went beyond any boundary of decency. If there was to be something other than an

---

**17.** The conduct of Mulherin, Larsen's agent, in this transaction was particularly reprehensible, improper, and unethical. Attorneys are prohibited from having direct contact with an opposing party who is represented by counsel. *See,* Disciplinary Rule 7–104(A)(1), *ABA Model Code of Professional Responsibility.* Minor, Kunkel's attorney, never gave Larsen or Mulherin permission to talk with Kunkel. In fact, Mulherin took affirmative action to prevent Kunkel from speaking to Minor when the $2 million promissory note was signed. On this ground alone, the loan security documents and guarantees must be rescinded and declared null and void.

enforceable obligation, Mulherin should have obtained Minor's clearance. To buttress our findings, it is clear the later lawsuits show the promissory note was not what Larsen represented it to be.

Further enforcing our findings was the timing of the signing of the documents, and five days later, the Letter of Intent. The total disregard by Larsen of his obligations under the Letter of Intent shows Larsen did not intend to make an equity investment in Pet, but, rather, wanted to gain control of Pet and Kunkel's assets.

■ The conduct of Larsen, and his agents, was reckless and with intent to cause severe harm. The harm is evidenced by the loss of a lifetime's work and the damage to Kunkel's marriage. That Susan and Donald Kunkel suffered severe emotional distress is evident during the course of the trial. We had ample opportunity to observe their demeanor with regard to this claim. We also heard evidence from a Kunkel family friend, and their minister, and learned how they departed from a gregarious couple, active in many community affairs, to virtual hermits, literally divorcing themselves from social intercourse as a result of their emotional distress (T.1107–1130). We found this uncontradicted evidence convincing and truthful.

Finally, we heard the testimony of how Susan Kunkel, a spouse, homemaker, and mother, lived in fear of losing her home because of documents she had never really understood, until this trial, and of which she had never received copies.

Based upon the foregoing, this Court finds Susan Kunkel suffered $500,000 in damages, and Donald, $250,000. The damages will also include an award of attorney's fees and costs for both the Kunkels.

(d) Interference with Dodge City Lease.

■ Kunkel was the owner of improved real property in Dodge City, Kansas, which was leased to Pet (T.665). Based upon prior stated findings of fact, it is clear that Larsen interfered with the lease between Kunkel and Pet with an intent to take the facilities from Kunkel. The only evidence being in the record as to damages coming from Banbury, we find Kunkel's damages to be the equity in the lease, namely $497,000.

(e) *Interference with York Lease.*

■ Kunkel was a partner in a partnership known as DGJ Properties (T.665–66) that owned property in York, Nebraska with improvements. The property was leased to Pet. Based upon the evidence adduced in the matter, it is clear that Larsen interfered with this lease, and caused, based on uncontradicted testimony, damages to Kunkel in the amount of $123,000 (equity of $205,000 X 60% ownership interest).

(f) *Affirmative Defenses.*

Based upon our findings and holdings, it is not necessary to address the affirmative defenses.

### CONCLUSION

Counselors for Pet and Kunkel are to settle an Order based upon this Memorandum of Decision.